2024 IL App (4th) 210304

NOS. 4-21-0304, 4-21-0309, 4-21-0310 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 13, 2024
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| MIDWEST GENERATION, LLC,<br><br>　　　　Petitioner-Appellant,<br><br>　　v.<br><br>THE ILLINOIS POLLUTION CONTROL BOARD,<br>　　　　Respondent-Appellee.<br>—————————————————————————<br><br>DYNEGY MIDWEST GENERATION, LLC;<br>ILLINOIS POWER GENERATING COMPANY;<br>ILLINOIS POWER RESOURCES GENERATING,<br>LLC; ELECTRIC ENERGY, INC.; and KINCAID<br>GENERATION, LLC,<br>　　　　Petitioners-Appellants,<br><br>　　v.<br><br>THE ILLINOIS POLLUTION CONTROL BOARD,<br>　　　　Respondent-Appellee.<br>—————————————————————————<br><br>AMERENENERGY MEDINA VALLEY COGEN,<br>LLC; and UNION ELECTRIC COMPANY, d/b/a<br>Ameren Missouri,<br><br>　　　　Petitioners-Appellants,<br><br>　　v.<br><br>THE ILLINOIS POLLUTION CONTROL BOARD,<br>　　　　Respondent-Appellee. | Petition for Direct Administrative<br>Review of the Order of the Illinois<br>Pollution Control Board.<br><br>PCB No. R20-19 |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Harris and DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1        In 2019, the Illinois General Assembly directed the Illinois Pollution Control Board (Board) to adopt rules establishing requirements for the construction, design, operation, and closure of coal ash surface impoundments. See Pub. Act 101-171 (eff. July 30, 2019) (adding 415 ILCS 5/22.59).

¶ 2        In April 2021, the Board issued its final order adopting part 845 of the Illinois Administrative Code (35 Ill. Adm. Code 845), which, among other things, (1) defined coal combustion residue (CCR) "surface impoundment" to include impoundments that no longer contain water (also called "dry impoundments") (see 35 Ill. Adm. Code 845.120 (2021)), (2) required the owner or operator of a CCR surface impoundment to conduct monthly groundwater elevation monitoring (*id.* § 845.650(b)), (3) required an owner or operator of a CCR surface impoundment who elected to close an impoundment by removing all of the CCR to also remove the impoundment liner (*id.* § 845.740(a)), and (4) required the owner or operator of a CCR surface impoundment who elected to close an impoundment by leaving the CCR in place to install a final cover system that is at least six feet thick (*id.* § 845.750(c)).

¶ 3        In May 2021, three separate petitions for administrative review were filed, challenging portions of part 845 on the basis that the Board either exceeded its authority or acted arbitrarily and capriciously. The petitions were filed by (1) Midwest Generation, LLC (Midwest); (2) Dynegy Midwest Generation, LLC, Illinois Power Generating Company, Illinois Power Resources Generating, LLC, Electric Energy, Inc., and Kincaid Generation, LLC (collectively, Dynegy); and (3) AmerenEnergy Medina Valley Cogen, LLC, and Union Electric Company, d/b/a Ameren Missouri (collectively, Ameren). On the Board's motion, we have consolidated the three petitions for review.

¶ 4　　　　We disagree with petitioners that the Board acted arbitrarily and capriciously or exceeded its authority and affirm the final order of the Board adopting part 845 as Illinois's first set of statewide standards regulating the storage and disposal of coal ash in surface impoundments.

¶ 5　　　　　　　　　　　　I. BACKGROUND

¶ 6　　　　　　　　　　A. CCR and Surface Impoundments

¶ 7　　　　When a power plant burns coal, it produces CCR, which contains contaminants like mercury, cadmium, and arsenic. Depending on the type of coal used, CCR can also contain such chemical constituents as barium, chromium, fluoride, lead, lithium, radium 226 and 228, and thallium. Because these chemical constituents of CCR are soluble and mobile, they pose a risk absent proper management of contamination to soil, surface water, and groundwater near power plants.

¶ 8　　　　CCR is a major form of industrial waste. In 2014, coal-burning facilities in the United States generated about 130 million tons of CCR. CCR can take the form of either wet sludge or dry powder. Dry CCR can be disposed of at a landfill. Wet CCR is generally sluiced by a pipe to an on-site surface impoundment.

¶ 9　　　　A CCR surface impoundment typically consists of (1) a primary cell, in which the majority of the solid particles settle out of the wastewater and (2) one or two secondary cells, in which the very fine suspended solids settle out of the wastewater (also called a "polishing pond"). Some CCR surface impoundments have a constructed liner, which allows the operator to utilize heavy equipment to remove ash from the surface impoundment and dispose of it off-site.

¶ 10　　　　　　　　B. Federal and State Regulation of CCR

¶ 11　　　　In 2008, a dike ruptured at a power plant in Tennessee, releasing 1.1 billion gallons of CCR into a nearby river. The incident prompted the United States Environmental Protection

Agency (USEPA) to develop rules, under the Resource Conservation and Recovery Act (42 U.S.C. § 6901 *et seq.* (2006)), regulating the storage and disposal of CCR. Simultaneously, the Illinois Environmental Protection Agency (IEPA) developed a coal ash impoundment strategy that required groundwater monitoring at all power plants in Illinois that use coal as a fuel source. Additionally, in 2011, the Board issued site-specific rules for the closure of Ameren's CCR impoundments at its Hutsonville power plant. See 35 Ill. Adm. Code § 840. After Ameren sought a site-specific rule for the closure of another 16 of its ash ponds at 8 other facilities, the IEPA proposed a rule of general applicability for *all* coal ash ponds at all power plants in Illinois.

¶ 12          In 2015, before Illinois's rules were completed, the USEPA issued its final rules regulating the storage and disposal of coal ash. These federal rules—codified in title 40, part 257, of the Code of Federal Regulations (40 C.F.R. § 257.51 (2015))—became effective on October 19, 2015. (We note that we will use terms "federal rule" and "part 257" interchangeably.) The federal rule defined " 'CCR surface impoundment \*\*\*' [as] a natural topographic depression, man-made excavation, or diked area, which is designed to hold an accumulation of CCR and liquids, and the unit treats, stores, or disposes of CCR." *Id.* § 257.53.

¶ 13          In 2016, Congress enacted the federal Water Infrastructure Improvements for the Nation Act (WIIN Act), codified in relevant part at section 6945. 42 U.S.C. § 6945(d). The WIIN Act provided for state regulation of CCR "units" in lieu of federal regulation *if* the state rules are "at least as protective" as the rules in federal part 257. *Id.* § 6945(d)(1)(B). (In this opinion, we, too, will use the term "unit" to mean a CCR surface impoundment.)

¶ 14          In 2019, the Illinois General Assembly passed Public Act 101-171, commonly called the Coal Ash Pollution Prevention Act, which consisted entirely of amendments to the Environmental Protection Act (Act). See Pub. Act 101-171 (amending 415 ILCS 5/1 *et seq.*).

Through this legislation, the General Assembly added section 22.59 of the Act, which directed the IEPA to promulgate, and the Board to adopt, comprehensive rules governing the construction, operation, and closure of CCR surface impoundments. See 415 ILCS 5/22.59 (West 2020). The legislature directed that "[t]he rules must, at a minimum *** be at least as protective and comprehensive as the federal regulations *** promulgated by the [USEPA] in [federal part 257] governing CCR surface impoundments." *Id.* § 22.59(g)(1).

¶ 15                      C. Rulemaking Under the Amendments

¶ 16                 1. *The IEPA's Proposed Rules and the First-Notice Order*

¶ 17          In March 2020, the IEPA filed with the Board its proposed new, statewide regulations for CCR surface impoundments, which, if adopted, would be codified at title 35, part 845, of the Illinois Administrative Code. (We will refer to the Illinois regulations as "the State regulations" or "part 845" interchangeably.) The proposed regulations were presented as a 135-page attachment to the IEPA's "Statement of Reasons," a 45-page document, which (1) explained the federal and state regulatory background of CCR and the purpose and effect of the proposed regulations and (2) contained a section-by-section summary of the proposed regulations.

¶ 18          In April 2020, the Board entered an "Opinion and Order" (the "first-notice order") (1) accepting the IEPA's proposal for rulemaking, (2) directing the clerk of the Board to publish first notice of the proposed rules in the Illinois Register, in accordance with the requirements of the Illinois Administrative Procedure Act (see 5 ILCS 100/5-40(b) (West 2020)), and (3) directing "the assigned hearing officer to proceed to hearing under the rulemaking provisions of the Act." The Board attached the IEPA's proposed rules as an addendum to the April 2020 order.

¶ 19          Relevant to this appeal, the IEPA proposal contained provisions (1) defining "inactive CCR surface impoundment" to mean "a CCR surface impoundment in which CCR was

placed before but not after October 19, 2015, and still contains CCR on or after October 19, 2015. Inactive CCR surface impoundments may be located at an active facility or inactive facility," (2) requiring monthly groundwater elevation monitoring, (3) providing that closure of a CCR surface impoundment by removal of the CCR was complete "when the CCR in the surface impoundment and any areas affected by releases from the CCR surface impoundment have been removed," and (4) providing that closure of a CCR surface impoundment by leaving the CCR in place required installment of a "final cover system" at least six feet thick.

¶ 20       The Board did not comment on the IEPA's proposed rules at this time.

¶ 21              2. *The Board's Request for an Economic Impact Study*

¶ 22       Also in April 2020, the Board submitted a written request to the acting Director of Commerce and Economic Opportunity, for the Department of Commerce and Economic Opportunity (DCEO), that the DCEO conduct an economic impact study of the proposed rule before June 2020. (We note that the DCEO did not perform the requested study.) That same month, the executive director of the Joint Committee on Administrative Rules (JCAR) submitted a written request to the chair of the Board that the Board provide to JCAR "an analysis of the economic and budgetary effects of the [proposed Part 845]" for use as part of JCAR's "review of this issue."

¶ 23       The publication of proposed rules marked the beginning of the first-notice period, during which interested parties—including industry groups, environmental groups, municipalities, and individuals—submitted questions, responses to questions, and public comments and during which public hearings were held. Midwest, Dynegy, and Ameren each participated in the first-notice period.

¶ 24       Specifically, the Board held two sets of hearings lasting four days and two days, respectively. Participants at the hearings included (1) the IEPA; (2) Environmental Law and Policy

Center, Prairie Rivers Network, Sierra Club, and Little Village Environmental Justice Organization (collectively, Environmental Groups); (3) Midwest, Dynegy, Ameren, and the City of Springfield, the Office of Public Utilities; (4) Illinois Environmental Regulatory Group; and (4) the office of the Illinois Attorney General.

¶ 25 The first set of hearings focused on the testimony of eight expert witnesses for the IEPA. The second set of hearings focused on testimony from (1) six expert witnesses for the Environmental Groups, (2) seven expert witnesses for Dynegy, (3) three expert witnesses for Midwest, and (4) two expert witnesses for Ameren. At the hearings, 58 exhibits were introduced and admitted. All of the witnesses testified under oath and were subject to cross-examination.

¶ 26 In addition to the hearings, the Board received both oral and written public comments. The Board held four separate hearing sessions for oral public comments, at which 120 members of the public provided comments. The Board also received 138 written public comments. We note that the record on appeal consists of over 29,000 pages of documents, transcripts, and exhibits.

¶ 27 3. *The Second-Notice Order and Second-Notice Period*

¶ 28 On February 4, 2021, the Board entered an order and opinion (the second-notice order) submitting a revised version of the proposed rules for review by JCAR. In the 105-page second-notice order, the Board (1) discussed contested issues and (2) made findings regarding those issues, including those provisions petitioners challenge in this appeal.

¶ 29 The entry of the second-notice order initiated the second-notice period under the Illinois Administrative Procedure Act, during which Midwest, Dynegy, Ameren, the Environmental Groups, the IEPA, and others addressed comments and arguments about the proposed regulations to JCAR.

¶ 30   4. *The Board's Final Order*

¶ 31   On April 13, 2021, JCAR certified its lack of objection to the proposed rules, and, on April 15, 2021, the Board issued its final order adopting the regulations as part 845 of the Administrative Code (part 845) (35 Ill. Adm. Code 845). The Board stated that it would not repeat the discussion of its rationales included in the second-notice order, thus effectively adopting the statements in the second-notice order as the Board's final statements on those points. The final order was thus relatively brief.

¶ 32   Midwest, Dynegy, and Ameren each filed separate appeals challenging portions of part 845. On the Board's motion, we consolidated the three appeals.

¶ 33   II. ANALYSIS

¶ 34   Dynegy and Midwest share three arguments. They contend that the Board exceeded its authority or acted arbitrarily and capriciously when it (1) defined "inactive CCR surface impoundment" to include impoundments that no longer contain liquid (see 35 Ill. Adm. Code 845.120 (2021)), (2) required monthly groundwater elevation monitoring (*id.* § 845.650(b)(2)), and (3) failed to properly address the technical feasibility and economic reasonableness of each of the provisions Dynegy and Midwest challenge.

¶ 35   Midwest alone argues that the Board acted arbitrarily and capriciously by requiring an operator who elects to close an impoundment by removing the CCR to also remove the impoundment liner and ancillary structures. See *id.* § 845.740(a).

¶ 36   Dynegy alone argues that that the Board acted arbitrarily and capriciously by requiring an operator who elects to close an impoundment by leaving the CCR in place to install a final cover system that is thicker than those required by federal part 847. See *id.* § 845.750(c).

¶ 37 Ameren argues separately that certain provisions of part 845 exceed the Board's authority because they have a retroactive effect, which the legislature did not explicitly authorize.

¶ 38 We disagree with petitioners that the Board acted arbitrarily and capriciously or exceeded its authority and affirm the final order of the Board adopting part 845 as Illinois's first set of statewide standards regulating the storage and disposal of coal ash in surface impoundments.

¶ 39 A. The Standard of Review

¶ 40 The Illinois Constitution provides that it is the public policy of the State "to provide and maintain a healthful environment for the benefit of this and future generations." Ill. Const. 1970, art. XI, § 1. To enforce that policy, the General Assembly passed the Act (415 ILCS 5/1 *et seq.* (West 2020)), which established the Board as an independent body comprised of five members with "verifiable technical, academic, or actual experience in the field of pollution control or environmental law and regulation" (*id.* § 5(a)). "The Board is charged with determining and defining environmental protection standards through rules and regulations." *County of Will v. Pollution Control Board*, 2019 IL 122798, ¶ 41, 135 N.E.3d 49 (citing 415 ILCS 5/5(b), 27(a) (West 2016)).

¶ 41 When the Board promulgates regulations, it acts in a quasi-legislative capacity. *Id.* ¶ 42. "The Board's regulations have the force and effect of laws, and they are presumptively valid." *Id.* The Board is "composed of technically qualified individuals [whose] expertise is essential in crafting regulations." *Id.* ¶ 43. Accordingly, judicial review of the Board's decision to adopt certain regulations is limited to determining whether the decision was arbitrary and capricious. *Id.* The party challenging the Board's decision to adopt a regulation bears the "heavy burden" of demonstrating that the Board's action was arbitrary and capricious. *Id.*; see *Granite City Division of National Steel Co. v. Illinois Pollution Control Board*, 155 Ill. 2d 149, 162, 613 N.E.2d 719,

- 9 -

724-25 (1993) ("Regulations adopted by the Board pursuant to its statutory authority will not be set aside unless they are arbitrary and capricious.").

¶ 42 In *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 505-06, 524 N.E.2d 561, 581 (1988), the supreme court provided the following guidance for determining whether an agency's action was arbitrary and capricious:

"While it is probably not possible to enumerate all the kinds of acts or omissions which will constitute arbitrary and capricious conduct, the following guidelines apply. Agency action is arbitrary and capricious if the agency: (1) relies on factors which the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision which runs counter to the evidence before the agency, or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

¶ 43 In *County of Will*, 2019 IL 122798, ¶¶ 44-45, the supreme court observed that, although the appellate court had applied *Greer* when reviewing decisions by the Board, the supreme court had not yet done so. Nonetheless, because the parties had framed their arguments using exclusively *Greer*'s three-factor rubric, the court also utilized the *Greer* framework for its analysis because "the parties' arguments would be otherwise difficult to cabin analytically." *Id.* Similarly, because the petitioners in the present case have framed their arguments utilizing the *Greer* factors, our discussion of their arguments will likewise utilize primarily the *Greer* framework. However, we reiterate that the *Greer* factors are not the exclusive ways in which an agency's decision may be found to be arbitrary and capricious.

¶ 44 For example, the *Greer* court also wrote that "[t]he standard is one of *rationality*," observing that "sudden and unexplained changes have often been considered to be arbitrary." (Emphasis added.) *Greer*, 122 Ill. 2d at 506.

¶ 45 Additionally relevant to this appeal, a Board's decision adopting a rule may be arbitrary and capricious if the Board failed to comply with the requirements of section 27 of the Act. See *Waste Management of Illinois, Inc. v. Pollution Control Board*, 231 Ill. App. 3d 278, 285-89, 595 N.E.2d 1171, 1175-78 (1992). Section 27(a) of the Act requires that the Board, when promulgating a regulation under the Act, "shall take into account *** the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution." 415 ILCS 5/27(a) (West 2020). Section 27(b) of the Act requires that the Board, when adopting any new rule, "shall, in its written opinion, make a determination, based upon the evidence in the public hearing record *** as to whether the proposed rule has any adverse economic impact on the people of the State of Illinois." *Id.* § 27(b). A regulation that fails to comply with section 27 may be declared invalid by a reviewing court. *Waste Management*, 231 Ill. App. 3d at 289.

¶ 46 Petitioners also challenge portions of the rule on the basis that the Board exceeded the authority granted to it by the legislature in section 22.59(g) of the Act. It is well established that (1) "[an] agency is limited to those powers granted to it by the legislature in its enabling statute" and (2) "[a]n act that is unauthorized is beyond the scope of the agency's jurisdiction." *Julie Q. v. Department of Children & Family Services*, 2013 IL 113783, ¶ 24, 995 N.E.2d 977. "When the agency renders a decision that [the agency] is without statutory authority to make, it is without jurisdiction and the decision is void." *Id.* Accordingly, "[t]he scope of powers conferred on an administrative agency by its enabling legislation is a question of statutory interpretation which we review *de novo*." *Id.* ¶ 20.

¶ 47                    B. The Definition of "Inactive CCR Surface Impoundments"

¶ 48          Both Midwest and Dynegy argue that the definition of an "inactive CCR surface impoundment" exceeds the Board's authority under the amendments because its applications make part 845 rules apply to sites that are not "CCR surface impoundments" under the Act. Alternatively, they argue that the definition is arbitrary and capricious under the *Greer* factors.

¶ 49                              1. *Additional Background*

¶ 50          When the legislature amended the Act to add section 22.59, which directed the Board to promulgate CCR rules, the legislature also added section 3.143 to the Act, which defined "CCR surface impoundment" to mean "a natural topographic depression, man-made excavation, or diked area, which is designed to hold an accumulation of CCR and liquids, and the unit treats, stores, or disposes of CCR." 415 ILCS 5/3.143 (West 2020). The legislature copied this definition from the federal part 257 definition of "CCR surface impoundment." See 40 C.F.R. § 257.53 (2015). The Board, in turn, adopted the same definition. See 35 Ill. Adm. Code 845.120 (2021). That is to say, the federal regulation, the Act, and the state regulation all share the same definition of "CCR surface impoundment."

¶ 51          The state and federal regulations diverge, however, when it comes to the definition of "*inactive* CCR surface impoundment." And the Act does not define that term at all. The federal regulation defined "inactive CCR surface impoundment" to include only those impoundments containing liquids. See 40 C.F.R. § 257.53 (2015) ("Inactive CCR surface impoundment \*\*\*.").

¶ 52          As noted above, the federal regulation defining "CCR surface impoundment" and "inactive CCR surface impoundment" went into effect on October 19, 2015. *Id.* § 257.51. Industry and environmental groups challenged portions of the federal regulation in federal court. In *Utility Solid Waste Activities Group v. Environmental Protection Agency*, 901 F.3d 414, 432-44 (D.C.

Cir. 2018) (*USWAG*), the circuit court for the District of Columbia determined that the USEPA acted arbitrarily and capriciously when it failed to regulate "inactive impoundments at inactive facilities" (commonly known as "legacy ponds"—liquid-containing CCR surface impoundments at closed power plants). The court explained that legacy ponds "are a particular subset of inactive impoundments" distinguished from active surface impoundments only by their location at *closed* plants. *Id.* at 432. The court reasoned that legacy ponds posed the same risks as active surface impoundments and the USEPA's approach, which was to wait until an imminent leakage was detected or attempt clean-up after a spill occurred, amounted to "shrug[ging] off preventative regulation" and "ma[de] no sense." *Id.* at 433. Accordingly, the USEPA

> "acknowledge[d] that (i) it ha[d] the authority to regulate inactive units, (ii) it [was] regulating inactive units at active facilities, (iii) the risks posed by legacy ponds [were] at least as severe as the other inactive-impoundment dangers that [part 257 sought] to address, and [(iv)] there [was] no logical basis for distinguishing between units that present[ed] the same risks." (Internal quotation marks omitted.) *Id.* at 434.

Thus, the court concluded that the legacy pond exemption was arbitrary and capricious and remanded that provision to the USEPA.

¶ 53    At the time of the Board's final order adopting part 845, the USEPA had not produced an updated rule. In August 2020, the USEPA stated that it would address the court's vacatur of the legacy unit provision in later rulemaking (see Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals from Electric Utilities; A Holistic Approach to Closure Part A: Deadline to Initiate Closure, 85 Fed. Reg. 53,516-18 (Aug. 28, 2020) (to be codified at 40 C.F.R. pt. 257)), which occurred in May 2023, when the USEPA proposed to amend part 257 to specify that legacy impoundments are subject to the same part 257 regulations

applicable to CCR surface impoundments at active facilities. See Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals from Electric Utilities; Legacy CCR Surface Impoundments, 88 Fed. Reg. 31,982-89 (proposed May 18, 2023) (to be codified at 40 C.F.R. pt. 257).

¶ 54                        2. *Whether the Board Exceeded Its Authority*

¶ 55         Midwest and Dynegy contend that section 22.59(g) of the Act, which requires the Board to regulate "CCR surface impoundments," leaves the Board without authority to adopt a definition of "inactive CCR surface impoundment" that includes liquid-free impoundments. Specifically, Midwest and Dynegy assert that by defining "CCR surface impoundment" to mean a unit that "*is* designed to hold an accumulation of CCR and liquids" (emphasis in original) the legislature evidenced an intent that the Board regulate only those units currently holding CCR and liquids—not former units holding only dry CCR.

¶ 56         Midwest and Dynegy additionally argue that by adopting the federal definition of "CCR surface impoundment," the legislature expressed its intent that the Board regulate the "same universe" of CCR surface impoundments as the federal rule. According to petitioners, when the Board defined inactive units to include dry units, it expanded the universe of regulated units beyond those regulated under the federal rule and, accordingly, exceeded the authority granted by the legislature. We disagree.

¶ 57         "[B]ecause administrative regulations have the force and effect of law, the familiar rules that govern construction of statutes also apply to the construction of administrative regulations." *Haage v. Zavala*, 2021 IL 125918, ¶ 43, 183 N.E.3d 830. "The surest and most reliable indicator of intent is the language of the regulation itself." *People ex rel. Madigan v.*

*Illinois Commerce Comm'n*, 231 Ill. 2d 370, 380, 899 N.E.2d 227, 232 (2008). So, when the language of a regulation is unambiguous, one must construe it as written. *Id.*

¶ 58 Section 3.143 of the Act defines "CCR surface impoundment" as "a natural topographic depression, man-made excavation, or diked area, which is designed to hold an accumulation of CCR and liquids, and the unit treats, stores, or disposes of CCR." 415 ILCS 5/3.143 (West 2020). The Board defined an inactive CCR surface impoundment to be one "in which CCR was placed before but not after October 19, 2015 [(the effective date of the federal regulation)] and still contains CCR on or after October 19, 2015." 35 Ill. Adm. Code 845.120 (2021).

¶ 59 Under the Board's definition, an "inactive CCR surface impoundment" is merely a type of "CCR surface impoundment." As the Board explained in its second-notice order, "for an impoundment to be an inactive surface impoundment, first it must be a CCR surface impoundment, which is defined in Section 845.120 [(35 Ill. Adm. Code 845.120 (2021))] as being designed to 'hold CCR and liquid.' "

¶ 60 Put another way, a CCR surface impoundment need only be *designed* to hold CCR and liquid, not currently holding CCR and liquid. Accordingly, a dry surface impoundment that was designed to hold liquid but no longer holds liquid first qualifies as a "CCR surface impoundment" by virtue of its design and next qualifies as an "inactive CCR surface impoundment" by virtue of its current state being liquid-free.

¶ 61 Further, if the plain meaning of "is designed to hold an accumulation of CCR and liquids" (40 C.F.R. § 257.53 (2015)) necessarily implies any "CCR surface impoundment" must *currently* hold liquid, the USEPA's definition of an inactive impoundment would contain surplusage. The federal definition states, an "inactive CCR surface impoundment" "means a CCR

surface impoundment that no longer receives CCR on or after October 14, 2015 and *still contains both CCR and liquids* on or after October 14, 2015." (Emphasis added.) *Id.* Specifying the unit "still contains \*\*\* liquids" would be redundant if containing liquid were inherent in the definition of a CCR surface impoundment.

¶ 62    Additionally, the plain language of the Act establishes that the legislature did not restrict the Board to regulating the "same universe" of surface impoundments as the federal regulations. Midwest and Dynegy ask this court to *infer* the legislature's intent from its adoption of the federal definition of "CCR surface impoundment." But we need not infer anything. The legislature clearly expressed its intent through the plain language it utilized in the Act. In section 22.59, the legislature expressly stated that (1) it is the long-standing policy of the State to protect the air, land, and waters of Illinois, (2) CCR has caused groundwater contamination "at active *and inactive* plants throughout this state," and (3) "environmental laws should be supplemented to ensure consistent, responsible regulation of all existing CCR surface impoundments." (Emphasis added.) 415 ILCS 5/22.59(a) (West 2020).

¶ 63    Importantly, the legislature also directed that (1) "[t]he provisions of [section 22.59] shall be *liberally construed* to carry out the purposes of this Section" (emphasis added) (*id.*) and (2) the Board shall adopt rules regulating, among other things, closure and post-closure care of CCR surface impoundments that "must, at a minimum \*\*\* be *at least* as protective and comprehensive as the federal regulations \*\*\* in [part 257] governing CCR surface impoundments" (emphasis added) (*id.* § 22.59(g)).

¶ 64    The plain language of the Act demonstrates that the legislature directed the Board to promulgate rules that would protect Illinois groundwater from CCR contamination at existing CCR surface impoundments at active or inactive plants. The legislature's command that the Board

- 16 -

promulgate rules that are *at least as* protective as the federal rules demonstrates that the legislature granted the Board authority to promulgate rules that were *more* protective than the federal ones.

¶ 65　　　　We additionally note that the legislature chose *not* to adopt the federal definition of "inactive CCR surface impoundments," leaving to the Board the task of defining that term. If the legislature had intended for the state definition of "inactive CCR surface impoundment" to be the same as the federal definition, it would have adopted the federal definition, as it did for "CCR surface impoundment."

¶ 66　　　　Accordingly, we conclude that the Board did not exceed its authority by defining "inactive CCR surface impoundment" to include CCR surface impoundments that are designed to hold liquid but do not currently hold liquid.

¶ 67　　　　　　　　　3. *Whether the Definition Is Arbitrary and Capricious*

¶ 68　　　　Midwest and Dynegy both contend that the Board's definition of "inactive CCR surface impoundment" is arbitrary and capricious. They frame their argument under the rubric of the *Greer* factors, asserting that the Board (1) considered a factor the legislature did not intend when the Board considered "whether a unit *was once* a CCR surface impoundment rather than whether it *is* a CCR surface impoundment on the date the [Act] was enacted (emphases in original)," (2) failed to consider an important aspect of the problem because it did not evaluate the potential for groundwater contamination from dry units, and (3) offered an explanation for its decision that runs counter to the evidence. We disagree.

¶ 69　　　　We have already concluded that the Board did not exceed its authority by including dry impoundments within the definition of inactive impoundments and, accordingly, have addressed Midwest and Dynegy's first argument. We now address Midwest and Dynegy's second and third arguments.

- 17 -

¶ 70                    a. The Board's Findings and Rationale

¶ 71         Because an agency's action must be upheld, if at all, on the basis articulated by the agency itself (*Department of Central Management Services v. Illinois Labor Relations Board, State Panel*, 2018 IL App (4th) 160827, ¶ 37, 116 N.E.3d 388), an understanding of the Board's explanation for including dry units in the part 845 definition of "inactive CCR surface impoundments" is necessary.

¶ 72         The Board's rationale for adopting the definition is contained within the second notice order. In that order, the Board noted that Dynegy objected to the IEPA's proposed definition, which included dry units, because it " 'expanded the scope of Part 845 beyond the [part 275] Rule, and more importantly, beyond the statutory mandate, by regulating units not fitting the legislature's definition of "CCR surface impoundment.' " Moreover, Dynegy argued that the " 'IEPA definition created confusion as to whether units that did not contain liquids as of the date of the [part 257] Rule became effective may be regulated under Part 845.' "

¶ 73         The Board also noted that the IEPA opposed retaining the federal part 257 definition of inactive surface impoundment because, in the IEPA's experience, "some unlined surface impoundments have leaked to the point that the CCR became dry." Moreover, " 'experience has shown a cover system is needed to control potential effects to health and to the environment to the maximum extent possible.' " The IEPA further opined that "an impoundment should not avoid regulation under part 845 simply because the liquids in the impoundment have already leaked into the environment or have been removed in preparation for closure."

¶ 74         The Board accepted the IEPA's proposed definition, stating as follows:

> "At issue is whether the inactive surface impoundment was 'designed to hold CCR and liquids, but still contains CCR,' or 'designed to hold CCR but

contains both CCR and liquids' on or after the proposed cutoff date of October 19, 2015. The Board agrees with the former intent, which is reflected in the IEPA's proposed definition.

*** 

The Board notes that for an impoundment to be an inactive surface impoundment, first it must be a CCR surface impoundment, which is defined in Section 845.120 as being designed to 'hold CCR and liquid.' The next condition is that CCR should have been placed in the impoundment before but not after October 19, 2015[,] and still contains CCR on or after October 19, 2015. [Citation.] Thus, the Board finds that the proposed definition of Inactive [*sic*] CCR surface impoundment does not expand of the regulations as argued by Dynegy. Further, the Board finds that the definition is consistent with the federal regulations and provides clarity on the unintended consequences of excluding CCR surface impoundments containing CCR that may have leaked or were drained before the cutoff date."

¶ 75    b. The Potential for Groundwater Contamination From Dry Units

¶ 76    Having set forth the Board's rationale for adopting the IEPA's proposed definition, which included dry impoundments, instead of incorporating the federal part 257 definition, which included only liquid impoundments, we turn now to Dynegy's and Midwest's argument that the Board, when adopting the more expansive definition, failed to consider an important part of the problem—namely, the absence of potential groundwater contamination from inactive *dry* impoundments. Put another way, Dynegy and Midwest contend that no evidence was presented during rulemaking that dry impoundments pose a risk to groundwater.

¶ 77     Although Midwest and Dynegy have attempted to frame their argument as fitting neatly within the second *Greer* factor, we need not engage in such complicated contortions; their argument is simply that the Board's inclusion of dry impoundments in part 845 regulation was not supported by evidence that dry impoundments pose a risk to groundwater.

¶ 78     We disagree. The Board explained the reasoning for its decision in the second notice order. Specifically, the Board noted that the IEPA opposed conforming the definition of inactive CCR surface impoundments with the federal definition because some unlined CCR surface impoundments have leaked to the point they have become dry. The IEPA opined that "an impoundment should not avoid regulation under part 845 simply because the liquids in the impoundment have already leaked into the environment or have been removed in preparation for closure."

¶ 79     The Board points in its brief to evidence presented during rulemaking that when dry coal ash becomes wet due to rainfall or flooding, it can leach into groundwater if the impoundment is not properly lined or covered. One example of such evidence is the written joint testimony of expert witnesses Scott Payne and Ian Magruder, who stated that high water tables can cause CCR surface impoundments to become inundated with groundwater. They explained, "The regular inundation of CCR in unlined or poorly lined impoundments creates a perpetual source of contamination to groundwater because the high groundwater will rewet the CCR even after the CCR impoundment is capped and closed." Similarly, expert witness Mark Hutson, when explaining in his written testimony why CCR must be permanently segregated from water, wrote the following:

> "During high water events, groundwater flows from the river into surrounding sediments and groundwater beneath and within the impoundment will rise in

response, resulting in groundwater *re-wetting* any disposed ash remaining in the impoundment. The result of this *re-wetting* of ash will be enhanced production of leachate. Even minor but more frequent flood events stimulate formation and release of CCR constituents to groundwater from any CCR that is occasionally saturated by high groundwater." (Emphases added.)

¶ 80        Because (1) the Board explained its reason for regulating dry impoundments and (2) the record contains evidence that dry CCR can pose a risk to groundwater, Midwest and Dynegy have not shown that the Board failed to consider an important aspect of the problem or that the Board's decision was unsupported by evidence when the Board adopted the IEPA's proposed definition of inactive CCR surface impoundment that included dry impoundments.

¶ 81        Dynegy contends that "extensive evidence was introduced *** that units no longer containing water do not present risks to groundwater warranting regulation under Part 845." Dynegy first points to a USEPA risk assessment finding that liquid-containing units were those most in need of regulation because of the hydraulic head imposed by impounded water. Because of this, the USEPA limited its regulation to liquid-containing units. However, as we have explained, the legislature gave the Board its blessing to promulgate rules that were more protective than the federal ones. Accordingly, the USEPA's decision to regulate only the *greatest* risk does not mean that the Board acted improperly when it decided to regulate lesser risks. The Board was specifically empowered to do so by the legislature.

¶ 82        Dynegy also points to evidence that treating its "Joppa West Ash Pond," a dry impoundment which has not received new CCR since the 1970s, as an inactive impoundment would cause disruption to the environment because the closure process would require it to disturb 100 acres of thick vegetation, including large trees.

¶ 83 However, as the Board has noted, it may apply adjusted standards when conditions at a site warrant them. Under the Act, "[a]fter adopting a regulation of general applicability, the Board may grant, in a subsequent adjudicatory determination, an adjusted standard for persons who can justify such an adjustment consistent with subsection (a) of Section 27 of this Act." 415 ILCS 5/28.1(a) (West 2020). When, as here, "a regulation of general applicability does not specify a level of justification required of a petitioner to qualify for an adjusted standard" (*id.* § 28.1(c)), the Board may grant individually adjusted standards, if among other things, "factors relating to that petitioner are substantially and significantly different from the factors relied upon by the Board in adopting the general regulation applicable to that petitioner" (*id.* § 28.1(c)(1)). Surely the Board is aware of its ability under its own regulations to adjust individual standards when appropriate.

¶ 84 For these reasons, Midwest and Dynegy have failed to show that the Board failed to consider an important aspect of the problem.

¶ 85 c. Whether the Board's Justifications Run Counter to the Evidence

¶ 86 Midwest and Dynegy assert the Board's explanation for the definition is "contrary to the evidence" (the first part of the third *Greer* factor) because the Board offered incorrect legal rationales for the definition. They contend that the Board provided three justifications for its inclusion of dry units: (1) the definition does not impermissibly expand the scope of part 845, (2) the definition is consistent with federal part 257, and (3) the definition provides clarity on the unintended consequences (of the federal rule's exclusion of dry units) of excluding CCR surface impoundments that may have leaked or were drained before the cutoff date.

¶ 87 As to the first point, we have already determined that the definition did not impermissibly expand the scope of part 845 and need not repeat that discussion here.

¶ 88        As to the second point, Midwest and Dynegy argue that a simple comparison of the definitions "make[s] clear that [the part 845 definition and the federal definition] do not cover the same units." However, in the second-notice order, the Board made clear it was adopting the expanded definition to avoid excluding "CCR surface impoundments that may have leaked or were drained before the cutoff date." Because the Board recognized its definition was broader than the federal definition, we will presume that when the Board stated that its definition was "consistent with" the federal one, it meant its definition *did not conflict with* the federal definition, not that it was *exactly the same as* part 257.

¶ 89        Regarding the third point, Midwest and Dynegy contend that no evidence was presented suggesting that the USEPA *unintentionally* excluded dry impoundments or of any unintended consequences flowing therefrom. However, we see nothing in the second-notice order suggesting the Board deemed that the USEPA had *unintentionally* excluded liquid-free units from its definition. Instead, the Board spoke of the "unintended *consequence* of excluding CCR surface impoundments containing CCR that may have leaked or were drained before the cutoff date." (Emphasis added.)

¶ 90        Moreover, the Board explained that it deemed the exclusion of dry impoundments in federal part 257 to have detrimental effects. Although the Board did not specify those effects, we can easily infer that the use of the federal definition resulted in disparate treatment of liquid containing impoundments that were drained as part of an approved closure process versus those that were drained under a less controlled process. In other words, the Board saw the use of the federal definition as creating a loophole for units that were dry either because they leaked or because their owners drained them in advance of the effective date of the federal definition. Given this disparity, the Board's use of the phrase "unintended consequences" is logical; the difference

in treatment created an incentive for CCR unit operators to drain units or allow them to go dry in advance of the federal rule's effective date.

¶ 91        On this point, Dynegy contends that this "unintended consequence" could never occur. Specifically, Dynegy notes that part 845 defines an "existing CCR surface impoundment" as one in which "CCR is placed both before and after October 19, 2015, or for which construction started before October 19, 2015 and in which CCR is placed on or after October 19, 2015." 35 Ill. Adm. Code. 845.120 (2021). Accordingly, Dynegy contends, existing impoundments are subject to the full set of part 845 regulations, and the dewatering of an impoundment after October 19, 2015, would not change this.

¶ 92        We agree with Dynegy that the Board's broadening its definition could not reach back into the past to remove the incentive to dewater an impoundment before October 19, 2015. But the second notice opinion suggests that the Board's concern was with the unintended consequence of the *IEPA*'s definition, which used the October 19, 2015, cutoff date, despite the IEPA's rulemaking occurring *before* that date. In other words, the Board wanted its rule to reach units dewatered in advance of part 257's promulgation. Moreover, the Board also stated it intended its definition to reach units dewatered through leakage. Such units would not necessarily be ones that had received CCR after October 19, 2015.

¶ 93        For the above reasons, we conclude that Midwest and Dynegy have not demonstrated that the Board's inclusion of dry impoundments in the definition of inactive CCR surface impoundments was arbitrary and capricious under any of the *Greer* factors.

¶ 94        C. The Requirement for Monthly Sampling of Groundwater Elevations

¶ 95        Midwest and Dynegy both contend the Board's decision to require operators to take monthly measurements of groundwater elevations at sampling wells (*id.* § 845.650(b)(2)) was arbitrary and capricious.

¶ 96                              1. *Background*

¶ 97                              a. Technical Background

¶ 98        The dispute here relates to the collection of hydrological data for the creation of a potentiometric map. Section 845.620 of part 845 (*id.* § 845.620) requires the operator of an impoundment to design and implement a hydrogeologic site characterization, which must include a "[m]ap of the potentiometric surface." *Id.* § 845.620(b)(16)(E). Important here, the data for potentiometric maps comes from measuring groundwater elevation—in other words, the level of the water in appropriate wells. The general purpose of groundwater elevation monitoring is to understand the direction and rate of groundwater flows. In section 845.650, the Board required groundwater elevation monitoring in order to predict when coal ash may merge with groundwater that flows to other bodies of water and drinking water sources. During rulemaking, the parties disagreed on how often groundwater elevation monitoring needed to be conducted.

¶ 99                              b. The Groundwater Monitoring Proposals

¶ 100        In the second-notice order, the Board set forth the proposals it had received from rulemaking participants regarding the monitoring of groundwater elevations. The IEPA originally proposed requiring operators to measure groundwater elevations monthly. Midwest and Dynegy both proposed quarterly monitoring, with Dynegy proposing the additional requirement of daily monitoring in one upgradient well and one downgradient well. Dynegy asserted that the IEPA's only basis for proposing monthly monitoring was that some commenters had asked for daily monitoring, which the IEPA believed was too burdensome. Dynegy explained that its proposed

daily monitoring at only two wells was based upon the recommendation of the Environmental Groups' witnesses, Magruder and Payne.

¶ 101　　　　The Board further noted that the IEPA opposed Dynegy's proposal because " 'it is impossible to produce an accurate potentiometric map from just two daily groundwater elevation levels—every other groundwater elevation on the map would have to be extrapolated from those two elevations.' " The IEPA believed, however, that a potentiometric map based upon monthly or quarterly groundwater elevation data would "help[ ] produce a visual demonstration of the direction and gradient of groundwater flow at a site for each sampling event during various times of the year."

¶ 102　　　　　　　　　　　　　c. The Board's Findings

¶ 103　　　　The Board agreed with the IEPA "that accurate potentiometric surface maps cannot be produced using only two daily groundwater elevation measurements." The Board also noted that it was standard practice for operators to measure groundwater elevation at all wells when conducting sampling required by other regulations, which occurred either quarterly or semiannually.

¶ 104　　　　The Board concluded as follows:

"As noted by Midwest Generation, IEPA proposed the monthly frequency under Section 845.650(b)(2) in response to comments it received prior to filing its proposal with the Board. Exh. 2 At 129-130. Since *the daily monitoring proposal is burdensome* and does not result in an accurate potentiometric surface map, the Board finds that *the monthly monitoring frequency is an appropriate compromise*. Therefore, the Board at second notice adopts the monthly groundwater elevation

monitoring requirement at Section 845.650(b)(2) without revision." (Emphases added.)

¶ 105    In its findings above, the Board cited pages 129-30 of exhibit No. 2, which constituted the IEPA's prefiled answers to questions it received following its prefiled testimony from its eight witnesses. At pages 129-30, the IEPA answered the following questions:

"a. Explain why monthly monitoring of groundwater elevation is required by Section 845.650(b)(2)?

Response: Public comments received by [IEPA] suggested daily groundwater elevation monitoring. [IEPA] believes that frequency would result in unmanageably large data sets for reporting, while monthly monitoring significantly reduces the data burden, but provides additional groundwater flow direction points between the quarterly analytical chemistry monitoring events.

b. How did [IEPA] determine this frequency was not overly burdensome or economically reasonable?

Response: Groundwater monitoring at Bureau of Water permitted sites such as mine refuse disposal areas and other waste water treatment impoundments utilize a quarterly frequency, as well as Bureau of Land cleanup programs, such as the Site Remediation program, use quarterly groundwater monitoring frequencies.

c. Is there a less burdensome method for accomplishing [the IEPA's] intent behind this provision?

Response: When drafting Part 845 [IEPA] determined that a quarterly monitoring frequency would meet the requirements of Section 22.59 of the Act, while being similar to many other groundwater monitoring programs within

- 27 -

[IEPA]. If the Board were to propose an alternative to quarterly chemical or monthly elevation monitoring schedules [IEPA] would consider the alternatives."

¶ 106                                2. *This Case*

¶ 107        Midwest and Dynegy argue that the Board's monthly monitoring requirement was arbitrary and capricious because the requirement failed each prong of the *Greer* test. Although Midwest and Dynegy shoehorn their arguments into the *Greer* rubric, their arguments boil down to an assertion that the requirement for monthly, as opposed to quarterly, groundwater elevation monitoring was simply a compromise between competing recommendations (1) from the Environmental Groups for daily monitoring and (2) the industry groups for quarterly monitoring. Put another way, Midwest and Dynegy contend that the monthly requirement was adopted (1) without technical justification and (2) in contravention of expert evidence supporting quarterly monitoring.

¶ 108        The Board responds that the requirement for monthly monitoring was not arbitrary and capricious because the record showed that quarterly monitoring offered a less complete data set for groundwater monitoring. We agree with the Board.

¶ 109        The Board, in its second-notice order, noted that (1) Dynegy itself proposed quarterly monitoring, with additional daily monitoring at two wells and (2) Dynegy's recommendation for the additional daily monitoring was based on testimony from the Environmental Groups' experts, Magruder and Payne. Dynegy's own proposal, then, implies that quarterly testing alone is insufficient.

¶ 110        Turning to the remaining options—(1) daily monitoring, as proposed by the Environmental Groups and (2) monthly monitoring, as proposed by the IEPA—the Board adopted monthly monitoring and referenced the IEPA's explanation for monthly monitoring, found at

pages 129-30 of exhibit No. 2. The IEPA, in response to questions received regarding the IEPA's witness testimony, explained that daily monitoring would result in unmanageable data sets and monthly monitoring would (1) reduce the data burden (2) while providing additional data for mapping groundwater flow.

¶ 111 The Board's decision to adopt monthly monitoring in lieu of daily or quarterly monitoring was supported by the evidence adduced during rulemaking and explained in the second-notice order. Accordingly, the Board did not act arbitrarily or capriciously by adopting the requirement for monthly groundwater monitoring.

¶ 112 D. The Requirement for Removal of Liners and Ancillary Equipment During

Closure by Removal

¶ 113 Part 845 allows owners and operators to elect to close a surface impoundment by either (1) removing or (2) covering the CCR. Section 845.740(a) applies to operators who "elect to close a CCR surface impoundment by removing all CCR and decontaminating all areas affected by releases of CCR from the CCR surface impoundment." 35 Ill. Adm. Code 845.740(a) (2021). In order for closure under this section to be complete, the operator must remove, in addition to all CCR and CCR residue, all "containment system components such as the impoundment liner and contaminated subsoils, and CCR impoundment structures and ancillary equipment." *Id.*

¶ 114 Midwest argues that the Board acted arbitrarily and capriciously by requiring removal of the impoundment liner because the Board (1) disregarded expert testimony that geomembrane liners are nonabsorptive and can be decontaminated, negating the requirement for removal, (2) lacked technical justification to require removal of the liner and associated equipment, (3) relied on factors the legislature did not intend it to consider—namely, the preamble to a proposed amendment to the federal regulation, and (4) made sudden and unexplained revisions to

the rule. For these reasons, Midwest contends, section 845.750(a)'s requirement that operators electing closure by removal also remove the impoundment liner fails all three prongs of the *Greer* test.

¶ 115    The Board responds that the requirement for functionless liners to be removed was not arbitrary and capricious because it furthered the purposes of the amendment by (1) ensuring compliance with the federal closure process and (2) requiring removal of functionless liners.

¶ 116                                    1. *Background*

¶ 117    Because the Board ultimately adopted an amended version of section 845.750(a), additional background about the IEPA's original proposed regulation and the Board's adoption of the amended proposed regulation is helpful to our analysis.

¶ 118     a. The Federal Rule and the IEPA's Original Proposed State Rule

¶ 119    In the first-notice order, the IEPA originally proposed a version of section 845.750(a) that was similar to the federal rule governing closure by removal, which read as follows:

> "Closure by removal of CCR. An owner or operator may elect to close a CCR unit by removing and decontaminating all areas affected by releases from the CCR unit. CCR removal and decontamination of the CCR unit are complete when constituent concentrations throughout the CCR unit and any areas affected by releases from the CCR unit have been removed and groundwater monitoring concentrations do not exceed the groundwater protection standard established pursuant to § 257.95(h) for constituents listed in appendix IV to this part." 40 C.F.R. § 257.102(c) (2015).

¶ 120    The IEPA's original proposed version of section 845.740(a), which was contained in the addendum to the first-notice order, closely tracked the federal rule and read as follows:

"Closure of removal by CCR. An owner or operator may elect to close a CCR surface impoundment by removing and decontaminating all areas affected by releases from the CCR surface impoundment. CCR removal and decontamination of the CCR surface impoundment are complete when the CCR in the surface impoundment and any areas affected by releases from the CCR surface impoundment have been removed."

¶ 121          b. The USEPA's Proposed Amendments to the Federal Rule

¶ 122          In March 2020, however, the USEPA issued notice of proposed changes to the federal rule. See Hazardous and Solid Waste Management System: Disposal of CCR; A Holistic Approach to Closure Part B: Alternate Demonstration for Unlined Surface Impoundments; Implementation of Closure, 85 Fed. Reg. 12,456 (proposed Mar. 3, 2020) (to be codified at 40 C.F.R. pt. 257). In what Midwest calls the "preamble" to the proposed amendments (that is to say, the USEPA's explanation of its proposed amendments preceding the proposed amendments themselves), the USEPA wrote as follows:

"C. Closure of CCR Units by Removal of CCR.

Closure by removal of CCR is one of two options provided in the CCR regulations to close a CCR surface impoundment or landfill. The closure by removal approach consists of two performance standards. First, the owner or operator must remove all CCR from the unit and decontaminate all areas affected by releases from the CCR unit. Second, the regulations specify that closure is complete when all CCR in the unit and any areas affected by releases from the CCR unit have been removed and groundwater monitoring demonstrates that there are no exceedances of any groundwater protection standard. See § 257.102(c).

- 31 -

Importantly, the second performance standard requires groundwater corrective action of a unit to be completed before the owner or operator can assert that closure of the unit has been completed." *Id.* at 12,468.

¶ 123    The USEPA then explained that state representatives had expressed concern that the requirement to complete groundwater corrective action can take longer to complete than the closure timeframes provided in the regulations. *Id.* at 12,469. As a result, the USEPA proposed an "additional closure [by removal] option" for owners or operators who could not complete the groundwater corrective action by the time all other closure by removal activities had been completed. *Id.* Under the new option, an owner or operator could select a "post-closure care" period that extended the time allotted for the corrective groundwater measures to be completed. *Id.*

¶ 124    The USEPA emphasized that it "[was] *not proposing any substantive revisions to the current closure standard* when closing by removal of CCR under § 257.102(c) and [was] not reopening those requirements to comment." (Emphasis added.) *Id.* Instead, the USEPA was "proposing to present the current closure standard in a *slightly revised format* to accommodate the proposed action." (Emphasis added.) *Id.*

¶ 125    After explaining the revision, the USEPA then wrote as follows:

"Removal and decontamination activities. These activities include removing or decontaminating all CCR and CCR residues, containment system components, contaminated subsoils, contaminated groundwater, and CCR unit structures and ancillary equipment. To qualify for the new closure by CCR removal option, [US]EPA is proposing that owners and operators would need to complete all removal and decontamination activities, except for groundwater corrective

- 32 -

action, which would be completed under the post-closure care provisions at § 257.104. To demonstrate that all CCR has been removed from the unit, the owner or operator would need to remove the entire contents of the CCR unit, including all CCR and any CCR residues. This would include, for example, the removal of any fugitive dust (CCR) discovered outside the waste unit boundary. In addition, any containment system components such as a bottom liner, contaminated subsoils, and unit structures and equipment (*e.g.*, concrete outlet structures and ancillary piping) would have to be removed prior to closure of the unit. Finally, any areas affected by releases from the CCR unit must have been removed (*e.g.*, impacted soils beneath the bottom liner system). The intent of this requirement is for the owner or operator to complete all CCR removal activities during closure prior to transitioning to the post-closure care period which will largely be a groundwater cleanup activity." *Id.* at 12,469-70.

¶ 126    The USEPA then provided the proposed revised section 257.102(c), which read as follows:

"(c) Closure by removal of CCR. An owner or operator closing a CCR unit by removal of CCR must follow the procedures specified in either paragraph (c)(1) or (c)(2) of this section. Closure by removal activities include removing or decontaminating all CCR and CCR residues, containment system components such as the unit liner, contaminated subsoils, contaminated groundwater, and CCR unit structures and ancillary equipment." *Id.* at 12,477.

Subsection (c)(1) described the procedure for completing all removal and decontamination activities during the active life of the CCR unit. Subsection (c)(2) described the procedure for

completing all removal and decontamination activities during the active life and post-closure care period of the CCR unit.

¶ 127 c. The IEPA's Proposed Amended State Rule

¶ 128 As a result, several months later, in October 2020, the IEPA proposed an amended version of section 845.740(a). The IEPA explained as follows:

"The current version of [the federal regulation] treats closure by removal and all associated corrective action as a single process, with closure not being complete until all corrective action has been completed. [Citation.] The USEPA proposal divides closure by removal into a two-step process. The first step is the physical removal of all CCR, containment systems and related structures, while the second step is the completion of any necessary groundwater corrective action."

¶ 129 The IEPA then opined that the proposed amendments to the federal rule were "more protective and comprehensive than [the federal rule] as it currently exists." The IEPA then pointed out ways in which proposed section 845.740 already incorporated some of these more protective features of the federal proposal but noted that section 845.740(a) as drafted contained only "generalized language that removal and decontamination of areas affected by releases must be completed for closure by removal." As a result, the IEPA proposed revising section 845.740(a) "using the specific language from [the federal proposed changes] describing how to complete closure by removal and an additional statement that closure by removal must be completed before groundwater corrective action." Specifically, the IEPA proposed to amend section 845.740(a) as follows:

"Closure by removal of CCR. An owner or operator may elect to close a CCR surface impoundment by removing all CCR and removing and decontaminating all

- 34 -

areas affected by releases <u>of CCR</u> from the CCR surface impoundment. CCR removal and decontamination of the CCR surface impoundment are complete when <u>all CCR and CCR residues, containment system components such as the impoundment liner and contaminated subsoils, and CCR impoundment structures and ancillary equipment have been removed. Closure by removal shall be completed before the completion of a groundwater correction action pursuant to Subpart F.</u> ~~the CR in the surface impoundment and any areas affected by releases from the CCR surface impoundment have been removed.~~"

¶ 130      d. The Board's Adoption of the IEPA's Proposed Amended State Rule

¶ 131      In February 2021, in the second-notice order, the Board adopted the IEPA's proposed amended version of section 845.740(a). The Board wrote the following when explaining its adoption of the amended regulation:

"IEPA proposes several changes to Section 845.740 *to clarify the proposed intent.* First, IEPA amends subsection (a) using language from Part 257 addressing closure by removal to describe how to complete closure by removal and an additional statement that closure by removal must be completed before any groundwater corrective action. \*\*\* This amendment, IEPA explains, *is intended to ensure consistency of the proposed rules with Part 257, which treats closure by removal as a two-step process*, *i.e.*, the physical removal of all CCR, containment systems and related structures followed by the completion of any necessary groundwater corrective action.

\*\*\*

- 35 -

*Board Findings.* The Board finds that the IEPA's changes ensure that the proposed rules are consistent with Part 257 and adopts them at second notice. (Emphases added.)"

¶ 132    To date, the USEPA has not adopted the amendments it proposed to part 257, described above.

¶ 133                                    2. *This Case*

¶ 134    We conclude that Midwest has failed to show that the Board's adoption of the amended section 845.740(a) was arbitrary and capricious.

¶ 135    The Board explained that its adoption of the IEPA's proposed changes to section 845.740(a) ensured consistency with the federal closure regulations. As we have noted above, the initial draft of section 845.740(a) closely tracked the language of the federal rule. When proposing amendments to the federal rule, the USEPA explained that the federal rule contemplated "two performance standards," being (1) removal and decontamination followed by (2) groundwater corrective action. Upon examining proposed amendments to the federal rule, the IEPA determined that the language of section 845.740(a) as proposed contained only "generalized language" that removal and decontamination must be completed before corrective action could begin but did not specify what was required for removal and decontamination to be completed. That is to say, the IEPA believed the state rule, as proposed, lacked specificity about when the first performance standard was met and when the second standard could begin. For that reason, the IEPA proposed adding language to the rule that would provide additional direction and ensure consistency with the federal rule and its dual performance standards.

¶ 136    The Board agreed and adopted the proposed language. We find no fault with the Board's explanation that it adopted the rule to ensure consistency with the federal rules, which was explicitly what the legislature called upon the Board to do.

¶ 137    Midwest contends that section 845.740(a) is not consistent with the federal rule because the liner removal requirement appears only in the preamble to the federal amendments and not in the federal rule itself. We reiterate that the legislature mandated the Board to promulgate rules that were *at least as protective as* the federal rules, not *exactly the same as* the federal rules. That is to say, the legislature gave the Board authority to promulgate more protective rules, but not less protective rules.

¶ 138    The IEPA believed, and the Board agreed, based upon the USEPA's interpretation of its own regulation, that greater clarity regarding what constituted completion of the removal process would *ensure* consistency with the federal rules. That is to say, whether the USEPA ultimately adopted the proposed amendments or not, clarifying the state regulation to provide explicit standards regarding completion of the removal portion of the closure process would *ensure* that the state regulation would never be less protective than the federal standard. In the context of the legislature's explicit mandate to the Board, section 845.740(a)'s liner removal requirement does indeed ensure consistency with the federal rule.

¶ 139    Furthermore, the Board acted well within its authority to impose the liner requirement. Importantly, the legislature explicitly directed the Board to "adopt rules establishing *** closure and post-closure care requirements" that "must, at a minimum *** *define when complete removal of CCR is achieved* and specify the standards for responsible removal of CCR from CCR surface impoundments." (Emphasis added.) 415 ILCS 5/22.59(g)(10) (West 2020).

¶ 140 Midwest also contends that the liner removal requirement (1) ignored expert evidence that a geomembrane liner could be decontaminated and left in place instead of removed and (2) lacked technical justification. We disagree.

¶ 141 First, Midwest points in its brief to the testimony of a single expert—its own—who testified that geomembrane liners can be decontaminated and opined that "allowing an effective liner to remain in place was a better and more environmental alternative than requiring removal and disposal of a perfectly good liner in a landfill." Midwest concedes that this testimony was given "regarding reuse of the liner to retrofit the liner compared to closure-by-removal," but it asserts that this is "a distinction without a difference."

¶ 142 We again disagree. Retrofitting a liner for further use is an entirely different context than leaving a useless liner in place after closing an impoundment. The Board was not obligated to credit testimony that a liner can be decontaminated and left in place *for further use* when promulgating standards for the closure by removal process, which contemplates *no further use* for the synthetic liner.

¶ 143 Second, the Board points to evidence presented during rulemaking that supports the liner removal requirement. Specifically, the Environmental Groups filed a final posthearing response addressing contaminated soil beneath impoundment liners with citations to authority. The filing establishes that soil underneath a liner can become contaminated with CCR, for example, through leaching or damage. During rulemaking, on cross-examination by Midwest, the IEPA explained that leaving the liner in place can prevent contaminated subsoil from being detected or removed. As such, the liner removal requirement is necessary to ensure the complete removal of CCR during the closure process.

¶ 144    Last, Midwest contends that the liner removal requirement was arbitrary and capricious because it constituted a sudden and unexplained revision to the final rule. We disagree.

¶ 145    In August 2020, the IEPA filed its prefiled answers to questions resulting from its prefiled testimony. In response to the question, "What does [IEPA] mean by 'decontaminated'?", the IEPA answered, "In the instance of closure by removal, decontaminated means removal of all ash, soil covers, liners, leachate within the impoundment, collection systems, and contaminated soil." Accordingly, we agree with the Board that Midwest was on notice as early as August 2020 that the IEPA believed liner removal was a necessary requirement for closure by removal.

¶ 146    For these reasons, we conclude that the Board's adoption of the liner removal requirement was not arbitrary and capricious.

¶ 147                E. The Requirement for Final Cover Systems

¶ 148    When an operator chooses to close an impoundment by leaving the CCR in place, both part 845 and part 257 require the operator to cover the dewatered impoundment with a final cover system. See 35 Ill. Adm. Code 845.750 (2021); 40 C.F.R. § 257.102(d) (2015). Part 845, however, requires thicker covers than its federal counterpart because the Board adopted the cover standard applicable to landfills contained in part 811 of the Illinois Administrative Code (35 Ill. Adm. Code 811)—a standard it previously adopted in part 840 of the Illinois Administrative Code (35 Ill. Adm. Code 840)—when it promulgated standards for a specific impoundment, Ash Pond D at the Hutsonville Power Station.

¶ 149    Dynegy argues that the Board acted arbitrarily and capriciously by requiring thicker cover systems because it (1) failed to justify the state standard with evidence showing a thicker cover requirement was superior to the federal standard and (2) ignored evidence that a less stringent standard would work as well.

¶ 150    We disagree with Dynegy and conclude that the Board stated an adequate reason for its cover system standard.

¶ 151                                    1. *Background*

¶ 152                           a. The Federal and State Standards Compared

¶ 153    Under both federal and Illinois rules, an operator may elect to close a surface impoundment by leaving the CCR in place and covering it with a final cover system consisting of two layers. See 40 C.F.R. § 257.102(d) (2015); 35 Ill. Adm. Code 845.750 (2021). The Illinois rule requires (1) a "low permeability layer" (35 Ill. Adm. Code 845.750(c)(1) (2021)) and (2) a "final protective layer" (*id.* § 845.750(c)(2)). The low permeability layer must consist of either (1) a compacted earth layer that is at least three feet thick or (2) a geomembrane layer. *Id.* § 845.750(c)(1). The final protective layer must also be at least three feet thick. *Id.* § 845.750(c)(2). Consequently, in Illinois, a final cover system comprised of a compacted earth layer and final protective layer must be at least six feet thick. See *id.* § 845.750(c)(1), (2).

¶ 154    In contrast, the federal rules require (1) an "erosion layer" (similar to the "low permeability layer") that must contain at least 6 inches of earthen cover and (2) an "infiltration layer" (similar to the "final protective layer") that must be at least 18 inches. 40 C.F.R. § 257.102(d)(3)(i) (2015). Consequently, under the federal rule, a final cover system constructed entirely of compacted earth must be at least two feet thick. See *id.* Put another way, the state standards require three times the thickness of the federal rule.

¶ 155    However, the state standards do not apply if the owner or operator can demonstrate an alternative system would "provide[ ] equivalent or superior performance" and the IEPA approves the alternative. 35 Ill. Adm. Code. § 845.750(c)(1), (2) (2021).

¶ 156                           b. Dynegy's Proposed Standards

¶ 157     During rulemaking, Dynegy argued against the proposed standard, arguing instead for standards requiring thinner layers. In support, Dynegy offered the testimony of Rudolph Bonaparte, who opined that, in most instances, Dynegy's proposed thinner standards would satisfy the performance standards of section 845.750(a), but under certain circumstances it might "be necessary to supplement [the standard] components with one or more additional engineering measures to achieve the performance standards.

¶ 158     Dynegy also offered the testimony of David Hagen, who opined that Dynegy's proposed standards would "not have an effect on the amount of percolation/infiltration when compared to the part 845 prescribed cap and cover system." Under at least one of the hydrogeological modeling approaches Hagen used, Dynegy's proposed rule could be more protective against percolation than the part 845 standard.

¶ 159     c. The Board's Explanation for Adopting the Standard and Findings

¶ 160     In the second-notice order, the Board (1) explained its basis for adopting the section 845.750(c) standards and (2) made formal findings.

¶ 161     i. *The Board's Discussion of Dynegy's Objection*

¶ 162     The Board noted that Dynegy had presented expert testimony to support reducing the requirement for the low permeability and final protective layers from 36 inches to 18 inches. It cited the testimony of Bonaparte and Hagen, noting that (1) Bonaparte testified covers on impoundments settle much less than those in landfills and (2) Hagen had used groundwater modeling to conclude that thinner cover layers would not increase the amount of water entering the impoundments.

¶ 163     ii. *The Board's Discussion of the IEPA's Response*

¶ 164    According to the Board, the "IEPA maintain[ed] that the proposed final cover standards are not overly protective because[,] unlike landfills[,] 'existing CCR surface impoundments closed with CCR in place have no low permeability liners and no leachate collection and removal systems.' " The Board further explained that the IEPA's objection was based on Bonaparte's testimony that Dynegy's proposed standards may not meet the performance standards of section 845.750(a)(1), which required "minimiz[ation] *** [of] post-closure infiltration of liquids into the waste and releases of CCR, leachate, or contaminated run-off to the ground or surface waters." *Id.* § 845.750(a)(1). According to the Board, the IEPA asserted that it was "not protective of groundwater to utilize a final cover which may or may not meet the performance standards and simply rely on one or more engineering measures."

¶ 165                    iii. *The Board's Findings*

¶ 166    The Board concluded the lack of low permeability liners in most Illinois impoundments justified standards more stringent than those of the federal rule. The Board noted that it derived its cover standards from the part 811 landfill standards, "which have been implemented for over 25 years" and which, in 2011, the Board had "found *** appropriate for the closure of *** Ashpond D."

¶ 167    The Board rejected Dynegy's proposal for thinner layers. Noting Bonaparte's testimony, the Board found that Dynegy's proposal would not satisfy its goal of creating a rule of general applicability capable of satisfying the protection standards at every site. It described the landfill rule as a "well-proven design standard" that would meet standards at all locations. The Board also noted that its rule permitted operators to petition for appropriate less stringent standards for "site-specific reasons."

¶ 168                    2. *This Case*

¶ 169    Dynegy argues that (1) no evidence was presented during rulemaking justifying the Board's decision to impose final cover system requirements derived from landfill standards that exceeded the requirements of the federal rule and (2) the Board ignored expert testimony supporting Dynegy's proposal for thinner layers. We disagree.

¶ 170    In the second-notice order, the Board provided a proper basis for its adoption of standards more stringent than the federal ones. The Board explained that "most existing CCR surface impoundments that will be closed in place have no low permeability liners." As a result, the Board believed that the proposed three-foot thickness for each layer, which was based upon landfill standards in place for over 25 years and which were implemented at the Hutsonville power plant, was necessary.

¶ 171    The Board's explanation demonstrates that it (1) considered Illinois's unique circumstances, which it was obligated to do through its section 22.59 legislative mandate to promulgate rules protective of *Illinois's* environment (see 415 ILCS 5/22.59 (West 2020)), and (2) relied on its experience with closure standards previously implemented at a specific impoundment.

¶ 172    We disagree with Midwest that the Board's decision (1) was unsupported by evidence and (2) ignored Dynegy's evidence to the contrary. The Board's written findings demonstrate that the Board gave ample consideration to the testimony of Bonaparte and Hagen. In fact, Bonaparte's testimony provided justification for the Board's decision to impose the stricter standards.

¶ 173    The Board also considered (1) evidence that existing impoundments lack low permeability layers, increasing the risk to groundwater and (2) the Board's own experience with the prior imposition of the stricter landfill standards at the Hutsonville impoundment. The Board

was free to assess the weight to be given to the various pieces of evidence and to ultimately decide that establishing more protective rules, particularly when setting default standards in rules of general applicability, was the better course.

¶ 174 We further note, as the Board points out in its brief, that section 845.750(c) sets only the *default* standards for final cover system thickness and allows the owner or operator to petition for lower standards upon proof that thinner layers would provide equal or superior performance. See 35 Ill. Adm. Code 845.750(c) (2021). Accordingly, by providing for site-specific adjustments, it cannot be said that the Board did not take into account Hagen's testimony. To the contrary, section 845.750(c) in its entirety appears to account for (1) evidence that most impoundments in Illinois lack low-permeability layers and (2) Bonaparte's and Hagen's testimony that thinner layers may not provide adequate protection in some circumstances but may provide adequate protection in others. Accordingly, the Board acted reasonably by both (1) setting more protective default standards and (2) allowing for site-specific adjustment.

¶ 175 F. Technical Feasibility and Economic Reasonableness

¶ 176 As we have noted, the Board's decision adopting a rule may be arbitrary and capricious if the Board failed to comply with section 27(a) of the Act (see *Waste Management*, 231 Ill. App. 3d at 285-89), which requires an agency, when promulgating a regulation under the Act, to "take into account *** the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution." 415 ILCS 5/27(a) (West 2020).

¶ 177 Midwest and Dynegy argue that the Board failed to consider the technical feasibility and economic reasonableness of (1) the definition of CCR surface impoundment, (2) the requirement for monthly groundwater monitoring, (3) the liner removal requirement, and (4) the final cover system specifications.

¶ 178    We disagree and conclude that the Board satisfied its obligation to take into account the technical feasibility and economic reasonableness of part 845, including the challenged provisions.

¶ 179    1. *The Applicable Law:* Granite City v. Pollution Control Board

¶ 180    In *Granite City*, 155 Ill. 2d at 155, the petitioners, a collection of steel companies, challenged the Board's amendments to its water quality standards adopted in a rulemaking proceeding. Specifically, the petitioners asserted that the Board's rulemaking was invalid because the Board failed to consider the technical feasibility and economic reasonableness of compliance with the proposed regulations, in violation of section 27(a) of the Act. *Id.* at 156.

¶ 181    The supreme court first noted, as we have also observed, that "the Board's promulgation of *** regulations is a quasi-legislative function [that] will not be disturbed unless the Board's action is clearly arbitrary, unreasonable or capricious." *Id.* at 180. The court continued, "When acting in its quasi-legislative capacity, the Board has no burden to support its conclusions with a given quantum of evidence" and "the burden is on [the] petitioners to establish the invalidity of the regulations." *Id.*

¶ 182    The supreme court also observed in that case that the overarching purpose of the Act was " 'to establish a unified, statewide program supplemented by private remedies, *to restore, protect and enhance the quality of the environment, and to assure that adverse effects upon the environment are fully considered and borne by those who cause them*.' " (Emphasis in original.) *Id.* at 182 (quoting Ill. Rev. Stat. 1989, ch. 111½, ¶ 1002(b)). Moreover, the Act required its terms to be liberally construed to achieve this overarching purpose. *Id.* (citing Ill. Rev. Stat. 1989, ch. 111½, ¶ 1002(c)).

¶ 183    Accordingly, the supreme court concluded as follows:

"Pursuant to section 5(b) of the Act [citation], the Board has authority to establish environment control standards and, in doing so, the Board must 'take into account' the factors enumerated in section 27(a) ***. Clearly, the authority granted to the Board is a general grant of very broad authority and encompasses that which is necessary to achieve the broad purposes of the Act. The factors set forth in section 27(a) which the Board must consider in promulgating regulations, including the technical feasibility and economic reasonableness of compliance, do not control the Board's authority to adopt a regulation. Rather than imposing a specific evidentiary burden on the Board, *** section 27(a) provides general standards to guide the Board in the exercise of its broad authority to ensure that the regulations adopted by the Board are reasonable.

Certainly, the Board's broad rulemaking authority is not limited by the extent of hardship that a regulation may cause to dischargers. The Board need not conclude that compliance with a proposed regulation is 'technically feasible and economically reasonable' before it can adopt such regulation. [Citation.] In fact, under certain circumstances, the Board can promulgate standards which it has found to be technically infeasible. [Citation.] If the Board, in its discretion and based on its technical expertise, determines that a proposed regulation is necessary to carry out the purpose of the Act, it may adopt technology-forcing standards which are beyond the reach of existing technology. [Citation.] ***

Indeed, the Act specifically provides for variance and adjusted standard procedures by which the Board may relieve a discharger from compliance with its

environmental control standards upon a showing of unreasonable economic or individual hardship." *Id.* at 182-83.

¶ 184    The supreme court summarized its holding as follows:

"[W]e conclude that section 27(a) does not impose specific evidentiary requirements on the Board, thereby limiting its authority to promulgate only regulations that it has determined to be technically feasible and economically reasonable. Rather, section 27(a) requires only that the Board consider or take into account the factors set forth therein. The Board must then use its technical expertise and judgment in balancing any hardship that the regulations may cause to dischargers against its statutorily mandated purpose and function of protecting our environment and public health." *Id.* at 183.

¶ 185    The supreme court further concluded that the Board did consider the technical feasibility and economic reasonableness of the regulations, pointing to the Board's statement in its final order that it had done so. Notably, in its brief findings on this subject, the Board observed that " 'it [was] reasonable to conclude that implementation of [the regulations] will have costs ranging upwards of several million dollars per year now and into the foreseeable future.' " *Id.* at 184. Nonetheless, according to the Board, this cost was reasonable when weighed against the expected benefit of an improved aquatic environment and the benefit to human health through the reduced presence of toxic substances. *Id.*

¶ 186    The supreme court closed with an observation that "the Board's determination that compliance is economically reasonable is a matter within its technical expertise and its discretion. We will not act as a superagency and interfere with the Board's judgment in this area." *Id.* The court upheld the regulations. *Id.* at 185.

¶ 187                                    2. *This Case*

¶ 188          In the present case, the Board addressed economic reasonableness and technical feasibility in its final order. First, the Board noted that it had requested an economic impact study from the DCEO but received no response. Next, the Board observed that 74 power-generating facilities in the State had existing, active, or inactive CCR surface impoundments and could be affected by the part 845 regulations.

¶ 189          The Board then addressed the technical feasibility of part 845, noting in particular that operators were already required under federal regulations "to install groundwater monitoring systems, conduct periodic groundwater monitoring, create closure and post-closure care plans, and, if necessary, conduct corrective action." The Board then noted that the final cover system requirements of part 845 were based upon part 811 landfill standards that were found to be appropriate in part 840 for the closure of the Hutsonville Ashpond D. The Board stated that both parts 811 and 840 had been found to be technically feasible. Last, the Board noted that "certain technical aspects of these rules that differ from the federal rules are based on existing regulations for landfills and site-specific rulemaking for CCR surface impoundments. Therefore, the Board finds that part 845 is technically feasible."

¶ 190          The Board also specifically addressed the economic reasonableness of part 845. The Board noted that the Act mandated the collection of fees and included provisions for financial assurance for all CCR surface impoundments that would be regulated by part 845. Higher fees would be imposed for units that had not yet initiated closure and lower fees would be imposed for units that had already completed closure. The Board also noted, similar to the technical feasibility considerations, that "many of the technical elements of Part 845 [were] already required under federal law, [and] others are consistent with the Board's existing waste disposal regulations under

Parts 811 and 840 that have been found to be economically reasonable." Accordingly, the Board concluded that its adopted rules were also economically reasonable.

¶ 191    As *Granite City* illustrates, petitioners bear the burden of showing that the Board failed to consider at all the technical feasibility and economic reasonableness of the part 845 regulations. We conclude that petitioners have failed to meet this burden because the Board's written findings show that the Board did consider, or take into account, the technical feasibility and economic reasonableness of the part 845 regulations.

¶ 192                              G. Retroactive Application of Part 845

¶ 193    Ameren argues that the definitions of "Inactive CCR surface impoundment" and "Inactive Closed CCR surface impoundment" have an improper retroactive effect that the legislature did not explicitly authorize in section 22.59(g). See 415 ILCS 5/22.59(g) (West 2020). Accordingly, Ameren asserts, any portions of part 845 that retroactively regulate the closure and post-closure care of sites that were closed prior to the effective date of section 22.59(g) are invalid.

¶ 194    The Board responds that (1) part 845 imposes only prospective standards and (2) even if part 845 had retroactive application, the legislature authorized such application.

¶ 195                              1. *Additional Background*

¶ 196    Section 22.59(g) of the Act authorized the Board to promulgate comprehensive rules governing CCR surface impoundments that are at least as protective as the federal regulations. *Id.* The effective date of section 22.59(g) was July 30, 2019. *Id.*

¶ 197    The federal regulations governing the disposal of CCR are found in federal part 257, subpart D. See 40 C.F.R. §§ 257.50 to 257.107 (2015). Subpart D regulations do not apply to "electric utilities or independent power producers that have ceased producing electricity prior to October 19, 2015." *Id.* § 257.50(e). Subpart D also states that it applies to "inactive CCR surface

- 49 -

impoundments at *active* electric utilities or independent power producers." (Emphasis added.) *Id.* § 257.50(c). This provision effectively exempts from regulation inactive surface impoundments at *inactive* facilities, commonly referred to as "legacy ponds."

¶ 198       As we have already discussed above (*supra* ¶ 52), environmental groups challenged the legacy pond exemption in *USWAG*. The *USWAG* court recognized that the exemption of "legacy ponds" from federal regulation meant that inactive impoundments at *inactive* facilities were subject to notably less stringent regulation than inactive impoundments at *active* facilities. *USWAG*, 901 F.3d at 432. Because "[t]he risks posed by legacy ponds are at least as substantial as inactive impoundments at active facilities," the *USWAG* court (1) held that the USEPA acted arbitrarily and capriciously by exempting legacy ponds, (2) vacated the exemption, and (3) remanded the vacated portions of part D. *Id.* at 433-34, 449.

¶ 199       To date, the USEPA has not replaced or amended the vacated provision.

¶ 200       When promulgating the state regulations, the Board adopted the following definitions, which Ameren challenges in this appeal:

> " 'Inactive CCR surface impoundment' means a CCR surface impoundment in which CCR was placed before but not after October 19, 2015 and still contains CCR on or after October 19, 2015. Inactive CCR surface impoundments may be located at an active facility or inactive facility.
>
> 'Inactive Closed CCR surface impoundment' means an inactive CCR surface impoundment that completed closure before October 19, 2015 with an Agency-approved closure plan." 35 Ill. Adm. Code 845.120 (2021).

¶ 201       Ameren contends that the Board's inclusion of October 19, 2015 (the effective date of the federal regulations) as the cutoff date to consider CCR surface impoundments closed under

the state regulations imposes improper retroactive obligations on CCR surface impoundments that Ameren closed (pursuant to state-approved closure plans) after October 19, 2015, but prior to July 30, 2019 (the effective date of the section 22.59(g) enabling legislation).

¶ 202    Specifically, Ameren points in its brief to certain former ash ponds that it closed with the approval and authority of the State prior to the enactment of section 22.59(g). For example, following the closure of the Hutsonville Ash Pond D in 2013, Ameren used the Ash Pond D closure plan as a road map for closing five other former ash ponds at the Hutsonville Plant. Ameren completed closure of Hutsonville Ash Ponds A through C and the Bottom Ash Pond in June 2015. Ameren's closure efforts with respect to two former ash ponds at the Meredosia plant were deemed "substantially complete" in December 2018. Ameren explains that its closure activities at Hutsonville and Meredosia (1) cost approximately $21.6 million, (2) were taken "in reliance on the IEPA's approval of the closure plans," and (3) were competed prior to the effective date of section 22.59(g), which was July 30, 2019.

¶ 203    Ameren contends that the Board's inclusion of "October 15, 2019," as the cutoff date for considering CCR impoundments to be closed imposes retroactive closure obligations on the aforementioned impoundments that Ameren closed after October 15, 2019. Ameren argues that because the legislature did not (1) enable the Board to promulgate rules until July 30, 2019 or (2) expressly state the temporal reach of section 22.59(g), the Board's regulations cannot reach back in time to impose new regulations on impoundments that have already been deemed closed (or substantially closed pursuant to a State-approved closure plan).

¶ 204    2. *The Applicable Law*

¶ 205    Illinois courts apply the test provided in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), to determine whether a statute may be applied retroactively. See *Commonwealth*

- 51 -

*Edison Co. v. Will County Collector*, 196 Ill. 2d 27, 39, 749 N.E.2d 964, 972 (2001). The Illinois Supreme Court has explained that, by adopting the *Landgraf* approach, the court " 'switched the focus of the *** retroactivity analysis from "vested rights" to legislative intent.' " *Perry v. Department of Financial & Professional Regulation*, 2018 IL 122349, ¶ 39, 106 N.E.3d 1016 (quoting *Doe A. v. Diocese of Dallas*, 234 Ill. 2d 393, 411, 917 N.E.2d 475, 486 (2009)).

¶ 206　　"Under step one of *Landgraf*, a court first determines whether the legislature has expressly prescribed the temporal reach of the new law." (Internal quotation marks omitted.) *Id.* ¶ 40 (citing *Commonwealth Edison*, 196 Ill. 2d at 39-40). "If the legislature has clearly indicated the temporal reach, then such temporal reach must be given effect unless to do so would be constitutionally prohibited." *Id.*

¶ 207　　However, "Illinois courts need not go beyond step one of the *Landgraf* approach" because "if the temporal reach has not been clearly indicated within the text of the new law, then the legislature's intent as to temporal reach is provided by default in section 4 [of the Statute on Statutes (5 ILCS 70/4 (West 2016))]." *Id.* ¶ 41.

¶ 208　　"Section 4 is a general savings clause, which [the supreme court] has interpreted as meaning that procedural changes to statutes will be applied retroactively, while substantive changes are prospective only." (Internal quotation marks omitted.) *Id.* ¶ 43. That is to say, under Illinois law, "where the legislature has not expressly indicated its intent as to temporal reach, a presumption arises that the amended statute is not to be applied retroactively." (Internal quotation marks omitted.) *Id.* ¶ 42.

¶ 209　　　　　　　　　　　　　　　3. *This Case*

¶ 210　　Ameren argues that the Board cannot promulgate regulations with retroactive effect unless the authorizing statute has *explicitly* granted the Board that power. Ameren further contends

that because section 22.59(g)(1) does not contain an explicit statement of the temporal scope *for the regulations* it authorizes, section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2020)) applies to bar the Board from promulgating regulations with retroactive effect. Accordingly, Ameren concludes that the Board lacked authority to utilize October 19, 2015, as the triggering date to determine a unit's closure status. We disagree.

¶ 211 We construe section 22.59(g) as authorizing regulations imposing new duties on existing impoundments when necessary to effectuate the purpose of the Act to restore and protect the environment. Moreover, Ameren has failed to show retroactive effect.

¶ 212 a. Section 22.59, Liberally Construed, Authorizes New Duties on Existing

Impoundments

¶ 213 "The scope of authority conferred on [an agency] by its enabling legislation is a question of statutory interpretation that [the court] review[s] *de novo*." *Genius v. County of Cook*, 2011 IL 110239, ¶ 25, 953 N.E.2d 407. Nevertheless, regulations adopted by an administrative agency are presumptively valid. *Medponics Illinois, LLC v. Department of Agriculture*, 2021 IL 125443, ¶ 31, 183 N.E.3d 79. Furthermore, when the legislature directs that a provision "be 'liberally construed' to carry out the purpose and policy expressly set forth therein," a court should heed that directive. See *In re Shelby R.*, 2013 IL 114994, ¶ 32, 995 N.E.2d 990 (requiring a court to heed such a provision in the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2010))).

¶ 214 Section 22.59(a) (415 ILCS 5/22.59(a) (West 2020)) sets forth the purposes of section 22.59—namely, to "promote a healthful environment, including clean water, air, and land, *** so as to protect public health"—and then states that, "[t]he provisions of this Section shall be liberally construed to carry out the purposes of this Section." Thus, section 22.59(g)'s grant of

regulatory authority should receive liberal construction. Accordingly, a liberal construction of section 22.59(g)(1)'s mandate that the Board promulgate rules that are "*at least as* protective and comprehensive" as the federal regulations (emphasis added) (*id.* § 22.59(g)(1)) means permitting retroactive amendments when they (1) promote a healthful environment and (2) are necessary to ensure consistency with the federal rules.

¶ 215 Moreover, we agree with the Board that the legislature intended for the Board to promulgate regulations that imposed new duties to remediate or prevent pollution of the environment caused by past activities at existing impoundments. Specifically, the legislature found that (1) it was the long-standing policy of the State "to *restore*, protect, and enhance the environment," (2) "CCR generated by the electric generating industry has *caused* groundwater contamination and other forms of pollution at active *and inactive* plants throughout this State," and (3) "environmental laws should be *supplemented* to ensure consistent, responsible regulation of *all existing* CCR surface impoundments." (Emphases added.) *Id.* § 22.59(a). The legislature chose not to exempt inactive or dry impoundments from regulation, emphasizing that the provisions of section 22.59(a) "shall apply, *without limitation*, to all existing CCR surface impoundments and any CCR surface impoundments constructed after the [July 30, 2019,] effective date of [the enabling legislation]." (Emphasis added.) *Id.* § 22.59(m).

¶ 216 Although the legislature did not use the word "retroactive" in section 22.59(g), the plain language the legislature did employ—particularly when liberally construed in favor of protecting the environment—clearly shows that the legislature intended that where the Board deemed appropriate, new duties could be imposed on existing impoundments.

¶ 217 b. Ameren Has Not Shown Retroactive Effect

¶ 218    Nonetheless, Ameren has not shown that the use of October 19, 2015, as the cutoff date for deeming an impoundment closed has a retroactive effect. A unit's closure status on a particular date is simply an antecedent fact, or preceding circumstance, which we discuss further below. Ameren has not offered any authority or argument suggesting the use of antecedent facts to determine when a rule applies is a retroactive application of a law under a section 4 analysis.

¶ 219    To the contrary, the supreme court's analysis in *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 25, 25 N.E.3d 570, suggests that Illinois law does *not* deem use of an antecedent fact as a trigger for a penalty to be a form of retroactivity. In *Hayashi*, the plaintiffs argued that an amendment to a professional licensing statute was "retroactive as applied to them because their health care licenses were revoked as a consequence of their [pre-amendment] convictions." *Id.* The new statute's "reliance on convictions predating its enactment [did] not render it retroactive as that term has been defined in case law." *Id.*

"Although the [amended law] relies upon antecedent facts—plaintiffs' convictions—for its operation, it does not apply retroactively to them. [Part of the new law] defines new *per se* eligibility requirements with which licensees must comply in order to practice their health care professions in Illinois. The [amended law] does not 'reach back in time' to change the criminal penalties imposed on plaintiffs' convictions, nor does it render unlawful conduct that was lawful at the time it was committed. [Citation.]" *Id.* ¶ 26.

¶ 220    Similarly, in *International Union of Operating Engineers Local 965 v. Illinois Labor Relations Board, State Panel*, 2015 IL App (4th) 140352, ¶ 30, 30 N.E.3d 1191, this court reiterated that "[a] statute does not operate retrospectively merely because it is applied [to] conduct

antedating the statute's enactment, [citation], or upsets expectations based in prior law." (Internal quotation marks omitted.)

¶ 221 Ameren cannot satisfy its burden to show the definition of an inactive closed impoundment applies retroactively if it cannot show that Illinois law has treated the sort of provision at issue as retroactive in some circumstance. Because Ameren cannot show that the use of a unit's closure status on October 15, 2015, to determine that the applicable regimen is "retroactive" in the sense used in section 4 of the Statute on Statutes, the entire argument fails.

¶ 222 For the reasons stated, we hold that Ameren has failed to meet its burden to show that the Board exceeded its statutory authority under the amendments when it used the units' closure status as of part 257's October 19, 2015, effective date to determine the regulations to which particular units were subject.

¶ 223                                III. CONCLUSION

¶ 224 For the reasons stated, we affirm the final order of the Board.

¶ 225 Affirmed.

*Midwest Generation, LLC v. Illinois Pollution Control Board*, 2024 IL App (4th) 210304

| | |
|---|---|
| **Decision Under Review:** | Petition for review of order of the Illinois Pollution Control Board, No. R20-19. |

| | |
|---|---|
| **Attorneys for Appellant:** | Kristen L. Gale, Susan M. Franzetti, and Vince Angermeier, of Nijman Franzetti LLP, of Chicago, for appellant Midwest Generation, LLC. |
| | Michael L. Raiff, of Gibson, Dunn & Crutcher LLP, of Dallas, Texas, and Joshua R. More, Robert A.H. Middleton, and Sarah L. Lode, of ArentFox Schiff LLP, of Chicago, for appellants Dynegy Midwest Generation, LLC, Illinois Power Generating Company, Illinois Power Resources Generating, LLC, Electric Energy, Inc., and Kincaid Generation, LLC. |
| | Claire A. Manning, Anthony D. Schuering, and Garrett L. Kinkelaar, of Brown, Hay & Stephens, LLP, of Springfield, for other appellants. |

| | |
|---|---|
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Jonathan J. Sheffield, Assistant Attorney General, of counsel), for appellee. |