2026 IL App (2d) 250166-U
No. 2-25-0166
Order filed March 26, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

MIDWEST GENERATION, LLC, Petitioner-Appellant,
v. THE ILLINOIS POLLUTION CONTROL BOARD and
THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY,
Respondents-Appellees.

Petition for review of order of Pollution Control Board.
PCB No. AS 2021-003

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: The Board did not err in denying petitioner's request for an adjusted standard. Affirmed.

¶ 2    Since 2019, petitioner, Midwest Generation, LLC (Midwest), has operated a power generating facility in Waukegan. The facility conducted coal-fired operations from 1923 to 2022. When power plants burn coal to generate electricity, coal combustion residuals (CCRs) are produced, which may include fly ash, bottom ash, boiler slag, and flue gas desulfurization materials. 415 ILCS 5/3.140 (West 2022).

¶ 3    The primary issue in this appeal is whether the Illinois Pollution Control Board (Board) correctly determined that a grassy area south of the power plant (the "grassy field")[1] constitutes a "CCR surface impoundment."  A CCR surface impoundment is defined by the Environmental Protection Act (Act) as "[a] natural topographic depression, man-made excavation, or diked area, which is designed to hold an accumulation of CCR and liquids, and the unit treats, stores, or disposes of CCR."  *Id.* § 3.143.

¶ 4    Specifically, on May 11, 2021, Midwest filed an adjusted standard petition under section 28.1 of the Act (*id.* § 28.1), seeking a finding from the Board that the grassy field was not subject to part 845 of the Illinois Administrative Code (Code), which contains regulations concerning disposal of CCRs in surface impoundments.  35 Ill. Adm. Code 845.750 (2021).  The regulations, which were adopted in 2021, include disposal standards for owners and operators of new and existing CCR surface impoundments, as well as *inactive* surface impoundments.  *Id.* § 845.100(b)-(c).  Midwest argued that the grassy field was not a CCR surface impoundment because it was not designed to hold an accumulation of CCR and liquids.  To the contrary, Midwest explained, it was once used to manage CCRs by promoting the drainage of liquid, with the intent to remove, not hold, water from the field.  The Illinois Environmental Protection Agency (Agency) disagreed, noting that the field was originally comprised of natural sand dunes that stored CCR and liquids, and, thus, it recommended that the Board deny Midwest's petition.  In sum, after a two-day hearing, the Board agreed with the Agency.  Midwest appeals.  See 415 ILCS 5/41(a) (West 2022); 35 Ill.

----

[1]The area in question has been called different names throughout the record, including the grassy field, former slag/fly ash storage area or the "FSFS area," and "old pond."  For simplicity, we refer to it as the grassy field.

Adm. Code 101.906, 102.706 (2021) (final Board orders may be appealed directly to the appellate court). For the following reasons, we affirm the Board's decision.

¶ 5                                    I. BACKGROUND

¶ 6      On February 13 and 14, 2024, the Board held a hearing to address Midwest's petition for an adjusted standard and the Agency's recommendation in response thereto. Public comments were received. Further, Midwest presented two lay witnesses (Christopher Lux and Sharene Shealey), two expert witnesses (Tom Dehlin and Douglas Dorgan, Jr.), and called three Agency representatives as adverse witnesses (Lauren Hunt, Lynn Dunaway, and Darin LeCrone). The Agency did not call witnesses or present expert reports.

¶ 7      For context, we briefly describe the property, which is located in an industrial area. The facility's power station is bordered to the north by a manufacturing facility. To the east, it is bordered by a beach and Lake Michigan. To the west sits a former tannery facility that has since been redeveloped as a switchyard. To the south, past the boundary line, is a sewage treatment plant.

¶ 8      Directly south of the power station (but still on the property) is an area that is roughly divided into thirds. From approximately 1946 to 1970, this entire area was referred to as the original slag field and was composed of sand dunes. Then, from 1970 to 1978, the eastern two-thirds became one large ash pond (referred to as the original ash pond) and use of the western third of the original slag field was discontinued. Finally, from 1978 to the present, the original ash pond was split into two separate, lined ash ponds (referred to as the east ash pond and the west ash pond). The remaining one-third area (again, the western third of the original slag field) was graded and seeded, becoming the grassy field at issue here. There is no liner underneath the grassy field.

¶ 9                                    A. Board Hearing

¶ 10                                    1. Lay Witnesses

¶ 11    Christopher Lux testified that he has worked at the Waukegan power station since 1992, or approximately 32 years. He is currently the station's operations and maintenance manager. The station is approximately 100 years old and sits in a primarily industrial area. The facility generally used coal as fuel to generate electricity, although coal was retired in 2022. Burning coal created two types of ash, which constitute CCRs: fly ash, which would burn off and be collected by precipitators, and bottom ash, which is heavier and would fall to the bottom of the boiler in the slag tanks. During Lux's tenure, the facility removed bottom ash from the slag tanks by sending it into the east and west ash ponds using a method called sluicing (*i.e.*, mixing ash with water and sending it someplace via a pipeline for treatment, storage, or disposal). The bottom ash/CCRs would be stored in the ponds until they were full enough to drain and dredge. The water was recycled and reused for continued sluicing, and a vendor would collect the CCRs from the dredged ponds for beneficial reuse.[2] To Lux's knowledge, the station does not have any other CCR surface impoundments, and Midwest does not utilize the grassy field for any purpose (although, in the past, it was used as a helicopter landing area for equipment preparation). In sum, Lux testified that, to his knowledge: (1) Midwest has never directed CCR or liquid to the grassy field, including as a part of sluicing activities; (2) Midwest has never used the grassy field to accumulate water or other types of liquid; (3) Midwest did not design the grassy field to receive or accumulate CCR, or water or any other liquid; (4) the grassy field is not part of the station's ash-management system; and (5) since he began working at the station, CCR has not been sluiced to the grassy field and, moreover, he has never seen the grassy field in any state other than its present one.

_____

[2]Neither pond is used for this purpose any longer, since coal is no longer being burned.

¶ 12    Sharene Shealey testified that she has been Midwest's environmental director for nine years.  Shealey has both bachelor's and master's degrees in chemical engineering.  In her role as environmental director, Shealey supports Midwest's environmental compliance and permitting efforts, and she monitors both current and pending regulations as they might apply to Midwest's facilities, including the Waukegan plant.  Shealey's environmental-compliance duties include those relating to CCR surface impoundments, such as groundwater monitoring, permit applications, inspections, and certifications.  Although the Waukegan facility historically burned coal, it is moving toward battery storage projects.  Like Lux, Shealey explained that, as far as she knows, Midwest uses the grassy field for "nothing," and (1) Midwest has never directed CCR liquid to the grassy field; (2) no sluicing activity is directed to the grassy field; (3) Midwest never used the grassy field to accumulate water or other liquid; (4) Midwest did not design the grassy field to receive an accumulation of CCR or liquid; and (5) the grassy field is not part of the station's ash management system.

¶ 13    Shealey further explained that the Act was passed in 2019, but the regulations in part 845 of the Code were not enacted until 2021.  However, on December 16, 2019, the Agency sent Midwest an invoice for three CCR surface impoundments at the Waukegan station, listing them as the (1) east pond; (2) west pond; and (3) "old pond."  Shealey testified that there is no such thing as the "old pond."  That term is not used at the station and, to her knowledge, no documents concerning the station refer to an "old pond."  To the extent that the phrase "old pond" encompassed the grassy field, Shealey disagreed with classifying it as a CCR surface impoundment, explaining that it would be difficult or impossible to comply with the regulations for a CCR surface impoundment if applied to the grassy field.  For example, she noted there exist requirements that Midwest conduct an analysis of the CCR that is to be placed in the impoundment,

but that analysis cannot be conducted for the grassy field because there will not be any CCR placed in the field. Similarly, there are requirements that Midwest provide a design flood plan for the waste or inflow streams that enter the impoundment; however, the required analysis of the chemical constitutions of all waste streams going into the grassy field cannot be performed, because there are no waste streams going into the grassy field, "[w]e do not use it." An inflow design plan "just doesn't make sense because it's not a CCR surface impoundment. It's a generally flat area of land." Likewise, the requirement to provide a history of construction for a required construction permit is not available for the grassy field because it was not constructed. She explained that she could not even fathom how to comply with requirements concerning the history of construction as "we can't pull design documents. We have none. It just doesn't fit the CCR surface impoundment scheme."

¶ 14　Shealey also monitors relevant federal regulations that implicate CCR surface impoundments. She testified that the federal Environmental Protection Agency (EPA) had proposed a regulation (that is now effective) concerning a new category called "CCR management units" (CCRMU). 40 C.F.R. § 257.53 (2024). In short, a CCRMU concerns an area of land on which any "non-containerized accumulation of CCR is received, placed, or otherwise managed" and includes inactive CCR landfills and CCR units that closed prior to October 17, 2015. *Id.* Thus, Shealey agreed that the EPA treats CCRMUs differently, in that "CCR surface impoundments have an element of design that [CCRMUs] do not and that is from the use of the word non-containerized." Shealey also confirmed that various EPA documents identified Midwest's Waukegan station as containing "*two* CCR surface impoundments named the east ash pond and west ash pond" (emphasis added), while listing the station as potentially having two CCRMUs, "old pond and historic field." Based on the EPA's listed sources, the Agency provided the EPA

some of the used terms, and she believed that "historic fill" or "historic field" probably referred to the grassy area. She explained that another EPA document identifies the Waukegan station as having four CCRMUs, which would include the grassy field. Shealey's takeaway from the EPA's rule is that the grassy field will be federally regulated as a CCRMU.

¶ 15 The result of the grassy field possibly being regulated by the Agency as a CCR surface impoundment, while simultaneously being regulated by the EPA as a CCRMU would leave Midwest "dealing with two sets of regulations for a single unit that are related but not the same [which] is a very complicated compliance task and so double regulations for the exact same unit would leave us at risk of noncompliance." Shealey explained that Midwest had proposed to the Agency remediating the grassy field in various ways and, further,

> "We want to solve the issue. We want to do it in a way that is appropriate, though. We want to remediate the grassy area but treating it as a CCR surface impoundment is not appropriate for that piece of land because it's never been one. It never will be one. It is an area that contains ash.

> ***

> We would love to close the grassy area. We are just looking for the appropriate regulatory path to do so. We disagree vehemently that to—that closing it as a CCR surface impoundment is appropriate."

¶ 16                                    2. Expert Witnesses

¶ 17 Douglas Dorgan, Jr., a consulting expert in site remediation and groundwater evaluation, testified that his work includes CCR surface impoundment remediation and closures. Dorgan performed a risk assessment for the conditions observed at the grassy field. He explained that the regulatory framework addresses historic fill areas, which are typically where unconsolidated coal

ash has been placed and left for a period, generally predating the CCR rules. Dorgan testified that, in his opinion, the grassy field is not a CCR surface impoundment but, rather, it is an unconsolidated ash fill area. In short, Dorgan explained that groundwater, soil, and sediment testing reflected that, to a reasonable degree of scientific certainty, the grassy field does not pose an unacceptable risk to offsite receptors (*i.e.*, humans or ecology). There are no potable water wells on site (or within a 2,500-foot radius of the site), land use will likely continue to be industrial for the foreseeable future, and there is low potential for human exposure. Further, Dorgan testified that 40 probes placed in the grassy field reflected that CCRs were present at levels near the ground surface and to a depth 17 feet below the surface. Leach testing of the materials reflected that concentrations remained below the groundwater quality standards, with the exception that boron was found at three locations and arsenic at one. Thus, to prevent typical CCR constituents from leaching into the groundwater, Dorgan proposed installing an engineered low-permeable barrier or cap on top of the grassy field. He explained that the field was not engineered and had no barrier to infiltration of rainwater, so the cap would eliminate infiltration so that rainwater could not percolate down through the ash already present in the area and eventually reach groundwater. In addition, Dorgan explained that several wells remain installed to help monitor the groundwater, and he also proposed a groundwater management zone that would allow, over time, evaluation of the cap's effectiveness. Dorgan noted that the property's groundwater flows in a southeast direction.

¶ 18    On cross-examination, the Agency asked whether Dorgan understood that ash was once sluiced to the entire original slag field, which included the area now referred to as the grassy field. Dorgan testified that, while he understood that ash is present in the grassy field, he did not know exactly how the ash was placed there. Upon examination by the Board, Dorgan agreed that it was

his opinion that "the coal ash present on the grassy field is not causing or contributing to any groundwater exceedance at the down-gradient monitoring wells located to the east of the east pond."

¶ 19    The second expert witness was Tom Dehlin, a consulting expert in CCR management. Dehlin holds bachelor's and master's degrees in civil and environmental engineering and is a licensed engineer in Illinois, Kentucky, and Wyoming. In his work, Dehlin reviews engineering and historical design drawings for surface impoundments. Dehlin was asked to prepare an expert report and opinion on the question whether the grassy field is a CCR surface impoundment under the Act. In short, he opined that the grassy field was neither a CCR surface impoundment, nor an inactive CCR surface impoundment (since inactive CCR surface impoundments must first be surface impoundments),[3] as the field was not designed to hold an accumulation of CCR and liquid.

¶ 20    Dehlin explained at length the bases for his opinion, and he methodically reviewed aerial photographs, design drawings, and permit records from the facility to interpret the intended development of the area south of the power facility. In summary, he explained that the facility initially sluiced ash to the entire original slag field. The original slag field consisted of sand dunes with a permeable, uneven sand floor.

¶ 21    Dehlin testified, however, that the area now referred to as the grassy field did not satisfy the definition of CCR surface impoundment because it was never designed to hold an accumulation of CCR and liquids. Dehlin stated that the term "accumulate" means to increase in volume and,

_____

[3]Inactive surface impoundments include "a CCR surface impoundment in which CCR was placed before but not after October 19, 2015, and still contains CCR on or after October 19, 2015. Inactive CCR surface impoundments may be located at an active facility or inactive facility." 35 Ill. Adm. Code 845.120 (2021).

in the context of a CCR surface impoundment, the increase in volume must be sufficient to allow for *sedimentation*. He further explained that, in his professional opinion, the accumulation of CCR *and* liquid is important to the definition because CCR surface impoundments are used as sedimentation basins to promote the settling of CCR particles from the sluice water. The accumulation of water allows particles to settle within the area prior to the water being discharged to another location, a process that Dehlin explained is distinct from infiltration.[4] Moreover, the sedimentation process requires a certain volume such that, with gravity and time, the CCR will settle, and it also requires some sort of barrier at the bottom of the basin to allow for accumulation.

¶ 22    In contrast, he explained, an infiltration process does not hold liquid but, rather, sends sluiced ash and water to a permeable floor (in this case, sand) which acts to separate CCR while water filters through the bottom. For infiltration to work, "you can't rely just primarily on the permeable floor, you can excavate a ditch to get water out of an area." Indeed, Dehlin reviewed several documents and testified that they reflected that, as early as 1939, there was a ditch running along the southern border of the property and, later, installation of a ditch in a north-south orientation to the west of the grassy field and connecting with the south ditch, both of which would have encouraged efficient removal of water from the premises. According to Dehlin, the purpose of a ditch is to "convey water off of an area." The south ditch would have allowed the natural

---

[4]The federal CCR rule setting standards for the disposal of CCRs in surface impoundments defines "infiltration" as "the migration or movement of liquid, such as surface water or groundwater, into or through a CCR unit from any direction, including from the surface, laterally, and through the bottom of the unit." 40 C.F.R. § 257.53 (2022). While "sedimentation" is not defined in the same federal CCR rule, it is defined elsewhere by the EPA (in water regulations) as "a process for removal of solids *before filtration* by gravity or separation." (Emphasis added). 40 C.F.R § 141.2 (2022).

water path to run in a southeast direction and discharge into Lake Michigan and keep it from entering the property of the neighbor to the south. Collectively, Dehlin explained, the documents reflected that the facility was removing CCR out of the station by sluicing it to the original slag field, but, while the field was meant to receive CCR, "it was also meant to remove water as efficiently as possible, whether that be through infiltration through the sandy floor[,] or if water was to make it to the southern end of the property, it would be received by the south ditch and would discharge into Lake Michigan."

¶ 23     Dehlin recognized that, while the Act requires that a CCR surface impoundment be "designed" to hold an accumulation of CCR and liquid, it does not define the term "design." He recounted that Merriam-Webster's dictionary contained two definitions that he found applicable, which he recited as, (1) "to create, fashion, execute, or construct according to plan; or (2) to conceive and plan out in the mind to have as a purpose or to devise for a specific function or event." To Dehlin, therefore, to "design" something means there exists intent for it to have a specific function. "There's a common phrase, form follows function. The way that you design something to be, to operate, it's for a specific purpose. There's intent behind it." As applied here, Dehlin testified that a CCR surface impoundment must be intended to hold an accumulation of CCR and liquid; there is intent for the area to hold an accumulation of CCR and liquids to promote sedimentation, which he described as the primary function of a CCR surface impoundment. Based upon his experience as an engineer and looking at the early photographs and documents, Dehlin testified there were no "design" features for the field: rather, a pipeline simply sent sluiced ash to the sandy floor, understanding that the water would infiltrate the sand while filtering out and keeping behind the CCR. Any potential water runoff would make its way to the southern end of the property. "I don't see any other design or intent to accumulate certain liquids." To the contrary,

Dehlin testified, "the intent was just to drain the liquids as fast as possible out of this area." Dehlin noted that the term "groundwater" is not found in the CCR surface impoundment definition, from which one may conclude that the presence of groundwater in an area has no bearing on whether that area is a CCR surface impoundment. Similarly, the method used to send the CCR and liquid to an area (*e.g.*, sluicing or another method) has no bearing on the definition.

¶ 24 In 1970, Dehlin explained, the eastern two-thirds of the original slag field was separated from the western third, which ultimately became the grassy field and was no longer used for CCR disposal from the station. Nevertheless, the south ditch was maintained to ensure the grassy field did not accumulate liquid. Thus, "the mechanism that was occurring in this area [*i.e.*, the grassy field] up until about 1970 was infiltration, not settling." Dehlin summarized his opinion,

> "The grassy field is not a CCR surface impoundment because it was never intended to accumulate liquids. In fact, the exact opposite. The station continually took measures to drain or infiltrate water out of that area. It wasn't until 1970 with the construction of the original ash pond do we see the first intended use of an area to accumulate liquids CCR for purposes of treating CCR sluice water."

He believed the grassy field may be classified as "non-containerized CCR fill." In his understanding, the grassy field falls within the federal EPA's category of a CCRMU, which includes non-containerized CCR. Finally, Dehlin noted that there are no piles of CCR sitting on the grassy field; rather, in the 1970s, it was graded and seeded and has remained that way since. He confirmed that, if the Board were to find that the grassy field was a CCR surface impoundment, while the federal rules categorize it as a CCRMU, it "becomes a logistical nightmare. You are trying to comply with regulations that treat the same area differently *** and it is very possible

that you have a federal timeline and a state timeline that do not match. And that's going to cause problems for Midwest Generation."

¶ 25 Dehlin explained the errors he found within the Agency's written recommendation (opposing Midwest's petition for an adjusted standard and concluding the grassy field satisfied the definition of a CCR surface impoundment). He further opined that the Agency, in making its recommendation, started with a conclusion, and then, when reviewing the evidence, looked for what fit that conclusion. Dehlin's primary criticism centered on the fact that the Agency described the process of infiltration through the sand dunes, yet concluded there was an accumulation of water. He reiterated that, when there is infiltration, an accumulation of water is not occurring and, because it was not designed to hold an accumulation of *both* CCR and liquids,

"the Agency is incorrectly concluding that ash sluice water being sent to this area makes it a CCR surface impoundment. But because we have infiltration and not accumulation—specifically accumulation to allow for sedimentation to occur—this site is not being operated, and certainly was not designed to operate, as a CCR surface impoundment."

He agreed that within the Agency's own recommendation it (1) defined "hold" as "to enclose or keep in a contained or with bounds or prevent from leaving or getting away," and synonyms include "keep" or "retain"; (2) recognized that the original slag field had no liner, was located on sand, and allowed for rapid infiltration of liquids; but (3) also found that the act of "holding" or keeping could be a temporary condition. Dehlin explained that "rapid infiltration" means liquid is leaving the area, not accumulating, and, further, that he disagreed that, in the context of a CCR surface impoundment, holding could be a temporary condition. More specifically, in order for a CCR surface impoundment to function as intended, there must be a volume of liquid that allows

for ash particles to settle to the floor, "so yes, it can be a temporary conditions, but you need *** a certain quantity of water in order for a CCR surface impoundment to function how it's designed to function." While there is no specific time frame in the definition, it must be enough time to accumulate that water for a CCR surface impoundment to function. The very nature of infiltration is to not retain water and the definition of "hold" is the opposite of infiltration. "You have a barrier. You have something that is containing that water to that specific area." For example, while a ditch can contain water within its area, the *purpose* of the ditch is not to hold it, but to convey it.

¶ 26    On cross-examination, Dehlin agreed that a sand dune might have a high point and a depression, and that the original slag field contained sand dunes. Further, he agreed that the low points or depressions in the sand dunes would be natural topographic depressions. He agreed that, while he could not say with specificity how often the facility sluiced ash to the original slag field, it likely operated such that there was a continuing, periodic addition of ash and water to the site. Dehlin agreed both that, there was no time frame or requirement in the definition related to the terms "hold" or "accumulation" and that, while water would infiltrate relatively quickly through sand, he did not know specifically how quickly the ash and water would have separated, once deposited in the field. Moreover, Dehlin agreed that the south ditch would have been constructed to convey any water that was accumulating within the original slag field to the south ditch, *i.e.*, to move an accumulation of water.

¶ 27    Dehlin clarified that, over time, the 1939 original sand floor would have seen a buildup of ash, such that the water that initially would have infiltrated through would have had the potential for accumulation. The ditch excavation would have been completed to drain that accumulation quickly and to more efficiently ensure that water was removed from the area. He explained that *having* an accumulation of water does not mean something was *designed* to hold an accumulation

of both CCR and liquid. Thus, even if the sand filter got "plugged up" by the ash, the station took active measures to excavate, ditch, and intentionally ensure that accumulated water was not permitted to remain. When asked to describe another example of a natural topographic depression as described in the definition, Dehlin opined it could be "a natural lake that was nearby to deposit CCR, which would allow CCR to settle and then be discharged out the other way."

¶ 28                               3. Adverse Witnesses

¶ 29    Midwest called three Agency representatives as adverse witnesses. Lynn Dunaway, a geologist and environmental protection specialist, worked on various projects for the Agency, including CCR-related programs. In short, Dunaway agreed that sluicing CCR to an area does not make that area a CCR surface impoundment and that the definition of CCR surface impoundment does not include a time frame for holding an accumulation. In the earliest photo of the area from 1939, the field contained a series of sand dunes composed of ridges and valleys. At some point, as evidenced by a 1946 aerial photograph, CCR material had been transported and collected there. Specifically, a pipe would transport an accumulation of ash and water to the sand dunes, at which point the ash and water would begin to separate, with the water infiltrating "in a relatively short time, I would expect, given the nature of sand[,] and the CCR would be left behind." The photos reflected to Dunaway that there was a draining pattern and water movement which caused an accumulation of CCR and liquid because,

> "the ash that was being sluiced was already an accumulation of CCR and liquids and the fact that that accumulation of CCR and liquids were deposited into the natural topographic depressions between the ridges of the sand dunes fits the definition of CCR surface impoundment because it's a natural topographic depression that has—that contains

- 15 -

an accumulation of CCR and water even if that accumulation of water lasted only for a short time."

Dunaway agreed that "contain" could also be described as "hold" and that an area could still hold CCR liquid material without a berm or manmade structure holding it in place because it can be held in a natural topographic depression. Dunaway further agreed that, once the ash and the water were deposited on the sand, the water (not the ash) infiltrated "all the way through" the sand, continuing, he assumed, to Lake Michigan. Midwest's counsel proposed the example of cooking pasta, wherein one mixes water and pasta in the pot and then, when ready, the pasta and water are poured into a sieve or colander. Dunaway opined that, in that example, there exists an accumulation of water and pasta that is poured into the colander and, moreover, the colander then holds the liquid "for a short time." Dunaway agreed that he is not an engineer.[5]

¶ 30　Lauren Hunt works for the Agency as an environmental protection geologist in the groundwater division. She testified that her only role regarding the Agency's recommendation that the adjusted standard be denied was to pull aerial photographs from Lake County or Google Earth maps and apply pins or labels to areas on the property. She did not perform aerial photograph interpretation for the recommendation.

¶ 31　Finally, Darin LeCrone is a licensed professional engineer and a permit manager for the Agency. He agreed that sedimentation is a process by which gravity and time remove solids from liquid in a basin. Typically, water is decanted off while trying not to disturb the sediments on the

---

[5]In contrast, when Dehlin was asked about the pasta example and, specifically, whether a sieve or colander holds an accumulation of liquid and pasta, he disagreed and answered, "No. The whole purpose of a sieve, the way it's designed is to get water out and keep the cooked pasta in so you can transfer it to whatever your next dish is." He explained that the sieve is filtering; it gets water out and leaves pasta in.

bottom. LeCrone agreed that "accumulation" is not defined in the regulations, but generally means the act or state of accumulating, which means to gather, heap a mass, or steadily increase in quantity. The process of infiltration is when liquid soaks into the ground, and it is typically a separate activity from sedimentation. He agreed that active infiltration of liquid would be separate from active accumulation. However, when asked whether a liquid mixed with a substance would at all accumulate while it was being filtered, LeCrone testified that it would depend on the type of filter and, in fact, it could accumulate for a "very, very short period of time I suppose[.]" LeCrone understood that CCR and water was sluiced out into the sand dunes, and the water would have separated and infiltrated the sand. During active sluicing, the water and ash mixture would have entered the area, the ash would fall out as the velocity dropped, and the water would move some distance until it either hit the sand or infiltrated, but the speed of that infiltration would depend on the grain size of the sand "and all the rest." The ash material would not immediately dry out and would retain moisture, but how much and for how long, he could not say. He agreed that sluiced water containing ash was held within the original slag area, where it was deposited for some period and, further, that the definition of CCR surface impoundment did not define a time associated with the act of accumulating. LeCrone testified that, even though the water infiltrated through the sand and left the CCR behind, the water was "held" for some period, as it would not immediately separate and infiltrate. "Whether it's seconds, days, I don't know how long it took." When presented with the example of cooked pasta and water being poured into a sieve or colander, LeCrone testified that the colander holds an accumulation of water for a very short period until it is separated. He agreed that filtering means to separate a material from liquid, and the liquid passes through a media of some sort. He was asked, "[s]o liquid is not held by the filter, right?" and he answered, "[n]ot for very long. It can slow down its flow and create back pressure[,] but it doesn't

- 17 -

hold it in the sense of holding in a vessel necessarily." Finally, LeCrone explained that his understanding was that the ash was being sluiced to the slag field on a regular basis, such that it would gather for some period or for as long as it took for separation to occur. "So there would be some measure of accumulation before any sort of infiltration would happen?" He answered, "I would interpret it as that, yeah."

¶ 32    The parties entered into evidence agreed stipulations, including that the Agency created the term "old pond," which does not appear in any agency permitting records for the Waukegan station, and, further, that the Agency has no knowledge that CCR was sent to the grassy field since approximately the 1970's.

¶ 33                                         B.  Board Decision

¶ 34    On March 20, 2025, the Board denied Midwest's petition. The Board summarized that Midwest argued that the grassy field failed to meet the definition of CCR surface impoundment because it was not designed to hold an accumulation of CCR and liquids and, instead, the sand floor and ditches worked to filter liquid away from the field. With respect to the Agency, the Board noted that the Agency maintained that the grassy field was a CCR surface impoundment because it was part of the original slag field, which was comprised of sand dunes that served as a CCR depository and functioned at one time as a storage area for CCR and liquids. The Agency asserted that infiltration and accumulation were not mutually exclusive, the definition does not specify a duration of contact between CCR and liquid or the volume of liquid in the accumulation, and that "even brief contact before the infiltration process or a residual volume of liquid post-filtration can meet the disputed second criterion of the [CCR surface impoundment definition]." The Board agreed.

¶ 35    The Board first noted that, to obtain an adjusted standard in this case, the Act required Midwest to prove four components: (1) factors relating to the grassy field are substantially and significantly different from the factors relied upon by the Board in adopting the applicable general regulation; (2) the existence of those factors justifies an adjusted standard; (3) the requested standard will not result in environmental or health effects substantially and significantly more adverse than the effects considered by the Board in adopting the rule of general applicability; and (4) the adjusted standard is consistent with any applicable federal law.   415 ILCS 5/28.1(c) (West 2022).  The Board determined that Midwest failed to establish the first three required components.

¶ 36    First, it rejected Midwest's contention that the factors comprising the grassy field were substantially and significantly different from those comprising a CCR surface impoundment.  The Board reiterated that the definition of a CCR surface impoundment requires three things: (1) a natural topographic depression, man-made excavation, or diked area; (2) designed to hold an accumulation of CCR and liquids; and (3) the surface impoundment treats, stores, or disposes of CCR.  *Id.* § 3.143.  Although Midwest disputed only the second part of the definition, the Board nevertheless addressed all three factors, as applied to the grassy field.

¶ 37    Specifically, the Board determined that the grassy field was a diked area.  It noted that a "dike" is defined as "an embankment, berm, or ridge of either natural or man-made materials used to prevent the movement of liquids, sludges, solids, or other materials." 35 Ill. Adm. Code 845.120 (2021).  In this case, the Board determined that the naturally formed sand dunes acted as natural ridges which served as barriers to the flow of sluiced CCR.  It found that the naturally formed barriers satisfied the core function of a dike, *i.e.*, they served to prevent the movement of CCR materials or liquids within the impoundment area.  Therefore, the Board found that the natural

ridges formed by the sand dunes sufficiently satisfied the definition of a "diked area" and, thus, the first criterion of a CCR surface impoundment was met.

¶ 38    Next, the Board noted that the definition required the area to "be specifically designed to hold an accumulation" *and* "this accumulation must include both CCR and liquids." The Board rejected Midwest's position that the grassy field was not designed to hold an accumulation of water but, rather, only an accumulation of CCR. It noted that, according to the Agency, water could not have flowed into the ditches surrounding the site without first accumulating in the sand dunes and, thus, the area "functioned as a surface impoundment because it utilized the natural topographic depression design within the dune field to hold an accumulation of CCR and liquids." The Board agreed.

¶ 39    It found that the facility's historical permits and photographs reflected that the entire 30-acre site was once designed to hold an accumulation of CCR and liquids and that the area was used for CCR management. Moreover, aerial photographs dating back to 1946 reflected an accumulation of materials, and boring logs showed the existence of wet ash and slag underground. Moreover, the Board found that the design requirement was satisfied by the fact that the sluiced CCR was originally conveyed into a "diked area" with the specific purpose of "allowing accumulation of sluiced CCR (CCR and water) long enough to settle CCR." It rejected Midwest's argument, which rested upon the term "accumulation" as containing an implied time element, finding that no such temporal requirement explicitly or implicitly exists in the statute or regulations. However, the Board found that, "while *accumulation necessarily includes a temporal element*, here there is no set amount of time associated with that time frame." (Emphasis added.) Nevertheless, "the natural topographical features (sand dunes) *** provided adequate retention time to accumulate sluiced CCR and water to allow for the settling of CCR." The act of "holding,"

the Board found, can be a temporary condition that serves a purpose. Here, that purpose was to allow for the settling of CCR. The Board also found that the definition of surface impoundment did not distinguish between infiltration or sedimentation and, further, that infiltration is not inherently incompatible with accumulation. It concluded that,

> "because the sluiced material was conveyed into a diked area [the original slag field which included the area now known as the grassy field] that was designed to hold an accumulation of the sluiced material within its boundaries, and because that material was a combination of CCR and liquids, the second criterion of the definition of CCR surface impoundment is satisfied."

¶ 40    Finally, the Board noted that Midwest did not dispute the third component of the definition and the fact that CCR was stored in the grassy field.

¶ 41    The Board next queried, "Is the [grassy field] an inactive CCR surface impoundment under Part 845, or is it a CCRMU?" It analyzed that question by noting that, when adopting the new federal CCRMU rule, the EPA provided an example of the differences between a CCR surface impoundment and a CCRMU and noted that, when adopting the CCR rule, it did not specify a certain amount of water needed for an area to qualify as a CCR surface impoundment or limit the CCR surface impoundments regulated to those containing a particular amount of water. In addition, the Board noted, the EPA described various examples of units that would fit the definition of a CCR surface impoundment, the last of which was a "diked area in which wet CCR is placed in order to remove the water for future transport to a CCR landfill or beneficial use." 89 FR 38993 (May 8, 2024). The Board reasoned that the EPA's example of a CCR surface impoundment mirrored the grassy field's use.

¶ 42    The Board concluded that the grassy field is an "inactive surface impoundment," in that it contains both CCR and water, but no longer receives additional waste.  Thus, the Board determined that Midwest failed to establish that the factors relating to the grassy field were substantially and significantly different from the factors relied upon in adopting the regulations concerning CCR surface impoundments.  415 ILCS 5/28.1(c)(1) (West 2022).  In addition, by failing to prove the "substantially and significantly different" factor, Midwest failed to establish that the factors relating to the grassy field justified an adjusted standard.  *Id.* § 28.1(c)(2).   Moreover, the Board found that Midwest had not established that applying an adjusted standard to the grassy field would not result in environmental or health effects substantially and significantly more adverse than would exist if the standard were applied.  *Id.* § 28.1(c)(3).  The Board agreed with the Agency that the grassy field remained unlined and constitutes "an inactive surface impoundment that has never been closed by removal, nor has any type of low permeability cover been installed on top of it.  The detection of CCR related constituents in excess of the applicable groundwater protection standards show that the grassy field presents [   ] environmental and health risks."  Finally, the Board *agreed* with Midwest that granting the adjusted standard would be consistent with federal law.  *Id.* § 28.1(c)(4).  In other words, if the Board granted Midwest's petition and found that the grassy field is not a CCR surface impoundment, it "would be regulated as either an open dump *** or a CCRMU."  Nevertheless, because the petition must fail if any one of the section 28.1 factors was not established, the Board denied the petition.

¶ 43    Midwest appeals.

¶ 44                                      II. ANALYSIS

¶ 45                                       A.  Overview

¶ 46    Midwest argues that the Board erred in determining that the grassy field satisfied the definition of a CCR surface impoundment under the Act, where it (1) found no minimum timeframe associated with the terms "hold" and "accumulation," nullifying those statutory terms; (2) disregarded the term "designed," rendering it meaningless; (3) interpreted the phrase "diked area" in a manner that ignored its plain meaning and context; and (4) determined that the grassy field is both a CCR surface impoundment and federal CCRMU, when those are mutually exclusive categories.  In addition, Midwest argues that the Board's findings were against the manifest weight of the evidence, where it (1) ignored evidence of historical usage, which demonstrated that the grassy field never held an accumulation of CCR and liquid; and (2) relied on the Agency's unverified recommendation and unsupported exhibits, which were refuted by unrebutted documentary and expert testimony that the grassy field was not designed to *hold* an accumulation of liquid.  Midwest asserts that the Board absurdly determined, in sum, that "a filter is designed to hold an accumulation of liquid, the purpose of the ditch is to contain liquid, and holding an accumulation of liquid can be for an instant."  It requests that we vacate the Board's order and remand for further proceedings.

¶ 47    In a joint brief, the Board and Agency respond, in sum, that the Board's interpretation of the CCR surface impoundment definition was reasonable and, further, that the Board's findings that Midwest was not eligible for an adjusted standard and failed to establish three of the four criteria for an adjusted standard were not against the manifest weight of the evidence.

¶ 48                              B.  Standard of Review

¶ 49    We review the Board's decision, not that of the Agency.  *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 3d 103, 118-19 (2007).  We will uphold the Board's determination unless it is contrary to the manifest weight of the evidence.  *Environmental*

*Protection Agency v. Illinois Pollution Control Board*, 308 Ill. App. 3d 741, 748 (1999). A decision is against the manifest weight of the evidence when it is unreasonable, not based in the evidence, or the opposite conclusion is clearly apparent. *Northern Illinois Service Co. v. Illinois Environmental Protection Agency*, 2016 IL App (2d) 150172, ¶ 34. Further, under the manifest-weight-of-the-evidence standard, we presume the Board's factual findings are *prima facie* true and correct, and we will not reconsider the evidence or render new factual determinations. See *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006) (establishing the Board's factual findings were against the manifest weight of the evidence is "a very high threshold to surmount. So long as the record contains evidence supporting the agency's decision, that decision should be affirmed"); *Environmental Protection Agency v. Illinois Pollution Control Board*, 252 Ill. App. 3d 828, 830 (1993) ("[a]n agency's decision is not against the manifest weight of the evidence if any evidence fairly supports the agency's action").

¶ 50     To the extent our review concerns a question of law, such as the interpretation of a statute, the Board's decision is not binding, and we review the question *de novo*. *Waste Management of Illinois, Inc. v. Illinois Pollution Control Board*, 356 Ill. App. 3d 229, 231 (2005). When interpreting a statute or regulation, our primary objective is to ascertain and effectuate the drafters' intent in enacting the provision, the best indication of which is the language used, given its plain and ordinary meaning. *Id.* at 243. It is improper for a court to depart from the plain statutory language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed intent; however, words and phrases must not be construed in isolation and must be interpreted in light of other relevant statutory provisions. *Id.*; see also *Palm v. Holocker*, 2018 IL 123152, ¶ 21. We have an obligation to construe statutes in a manner that will avoid absurd,

unreasonable, or unjust results that the drafters could not have intended. *Holocker*, 2018 IL 123152, ¶ 21.

¶ 51    We note that, in the administrative review context, "[e]ven where review is *de novo*, an agency's construction is entitled to substantial weight and deference. Courts accord such deference in recognition of the fact that agencies make informed judgments on the issues based upon their experience and expertise and serve as an informed source for ascertaining the legislature's intent." *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 387 n.9 (2010); see also *Central Illinois Public Service Co. v. Illinois Pollution Control Board*, 116 Ill. 2d 397, 405, 409-10 (1987) (deferring to the Board's interpretation in an adjusted-standard case and noting that "[c]ourts will give substantial deference to the interpretation of a statute by the agency charged with its administration and enforcement;" and "since the Board is charged with administering the Environmental Protection Act, its interpretation of the statute is entitled to deference"); *People ex rel. Raoul v. Illinois Commerce Comm'n*, 2025 IL App (2d) 230020, ¶ 28 (while courts are not bound by an agency's rulings on questions of law, which we review *de novo*, we have consistently afforded substantial weight and deference to an agency's interpretation of a statute that it is charged with administering and enforcing).

¶ 52         C. Board's Decision is Not Against the Manifest Weight of the Evidence

¶ 53    Preliminarily, it is undisputed that, to obtain an adjusted standard in this case, the Act requires Midwest to prove four components: (1) factors relating to the grassy field are substantially and significantly different from the factors relied upon by the Board in adopting the applicable general regulation; (2) the existence of those factors justifies an adjusted standard; (3) the requested standard will not result in environmental or health effects substantially and significantly more adverse than the effects considered by the Board in adopting the rule of general applicability; and

(4) the adjusted standard is consistent with applicable federal law. 415 ILCS 5/28.1(c) (West 2022). It is also undisputed that Midwest's failure to prove any one of the factors defeats the petition. See *People v. Parcel of Property Commonly Known as 1945 N. 31st St., Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 501 (2005) (generally, the use of the conjunctive word "and" reflects that the legislature intended for all listed requirements to be satisfied). Here, the Board found that Midwest failed to satisfy the first three components. For the following reasons, we conclude that the Board did not unreasonably find that Midwest failed to establish the first, and, by extension, the second factors. Thus, we do not need to address the remaining factor, as Midwest's appeal fails.

¶ 54 Midwest premised its petition for an adjusted standard on the argument that the grassy field was not a CCR surface impoundment and, thus, it was substantially and significantly different from the units the regulations are meant to govern. Again, a CCR surface impoundment consists of three elements: (1) a natural topographic depression, man-made excavation, or diked area; (2) which is designed to hold an accumulation of CCR and liquids; and (3) the unit treats, stores, or disposes of CCR. 415 ILCS 5/3.143 (West 2022). Midwest sought an adjusted standard and relief from the regulations governing CCR surface impoundments based on the second element of the definition, *i.e.*, on the basis that the grassy field was not designed to hold an accumulation of CCR

and liquids.[6]  It did not dispute that the grassy field satisfied the first and third elements of the definition.[7]

¶ 55    Addressing the second element, Midwest asserts that it presented a thorough and robust case in chief, with expert opinions, while the Board presented only an unverified Agency recommendation that prejudged the grassy field's classification.  Midwest contends that the Board's finding that a filter or sieve holds an accumulation of liquid is absurd and illogical, and the opposite conclusion is clearly evident.  Midwest's primary evidence in support of its contention that the grassy field was not designed to hold an accumulation of CCR and liquids was presented through Dehlin's testimony, his report, and the exhibits upon which he relied.  However, even accepting Dehlin's testimony concerning the property's history, his expertise regarding CCR surface impoundments, the processes of sedimentation and infiltration, etc., the Board could have reasonably disagreed with his conclusion.  See, *e.g.*, *Lapp v. Village of Winnetka*, 359 Ill. App. 3d 152, 167 (2005) ("as the fact finder, the [administrative agency] has the responsibility to hear the testimony of the witnesses, to determine their credibility, to weigh the testimony of each witness,

[6]In opening statements, Midwest's counsel reviewed the definition and explained, "Midwest Generation will demonstrate that the grassy field does not fall within the definition of a CCR surface impoundment because it does not meet the *second part* of the definition. It is not and never was designed to hold an accumulation of CCR and liquids." (Emphasis added.)

[7]Thus, although, on appeal, Midwest challenges the Board's specific determination that the grassy field was a "diked area," we need not address that portion of the Board's findings.  Midwest did not challenge below (or on appeal) the fact that the grassy area satisfied the first component of the CCR surface impoundment definition, *i.e.*, that it is a "natural topographic depression, man-made excavation, or diked area[.]"  415 ILCS 5/3.143 (West 2022).

and then to draw reasonable inferences from all the evidence"). Further, its ultimate findings were supported by the evidence. *Marconi*, 225 Ill. 2d at 540 ("[s]o long as the record contains evidence supporting the agency's decision, that decision should be affirmed").

¶ 56 First, for example, the Board's findings that sedimentation and infiltration are not inherently incompatible, and that, even with infiltration, the grassy field's conditions encouraged accumulation of both liquid and CCRs, was not unreasonable. Dehlin's testimony clearly emphasized his opinion that infiltration does not "hold" liquid and, thus, sedimentation is the process by which a CCR surface impoundment is intended to operate. However, the Board correctly noted that the statute itself does not specify the process by which a CCR surface impoundment must operate; it does not expressly limit that process to areas which utilize *only* sedimentation, as opposed to infiltration. Indeed, the federal CCR rule contemplates infiltration in CCR units (40 C.F.R. § 257.53 (2022)) and other federal regulations define sedimentation as a process that may occur in conjunction with infiltration (*id.* § 141.2 (sedimentation is a process for removing solids "before filtration")). Moreover, Agency adverse witness LeCrone also explained that, even though sedimentation and infiltration operate differently, they are not necessarily mutually exclusive. Had the Board interpreted the statute as limiting impoundments to areas that allow only for sedimentation, it would have impermissibly inserted limitations and conditions that the legislature plainly did not intend. *Holocker*, 2018 IL 123152, ¶ 21.

¶ 57 Therefore, whether by sedimentation, infiltration, or a combination thereof, the statute's expressed parameter is merely that the unit "hold an accumulation" of "CCR and liquid." The Board's interpretation and application of the phrase "hold an accumulation" was not unreasonable. Midwest contends that the plain meanings of "hold" and "accumulation," particularly in the CCR surface impoundment context, reflect that the Board's interpretation of those terms was incorrect.

Midwest points out that even the Board recognized that to "hold" means to enclose or keep in a container or within bounds. It again notes Dehlin's testimony that the ability to hold and accumulate liquid is critical to the definition because accumulation serves the functional effect of allowing for sedimentation and, moreover, that both the Agency and Dehlin agreed that sedimentation requires gravity and *time*. Nevertheless, Midwest argues, the Board found *no* temporal requirement for "hold" or "accumulation," impermissibly nullifying those terms. It contends the Board's interpretation is absurd because it suggests that holding an accumulation includes everything a liquid touches regardless of time, whereas accumulation requires an extended period, longer than an instant. Midwest argues that the Board's interpretation leads to an extraordinary expansion of the ordinary meaning of the phrase "hold an accumulation," as it would include even a wet towel or wet pasta. We disagree.

¶ 58 Again, the statute itself plainly does not specify that a CCR surface impoundment must operate only through sedimentation. Nor does the statute specify how long the impoundment must "hold" the accumulated CCR and liquid, a fact Dehlin acknowledged. Further, although the Board noted that the statute does not specify how long the liquid must be held, it did not absurdly interpret the language to include anything that gets wet, irrespective of time. Indeed, we outright reject Midwest's position that the Board found that a unit may be an impoundment, as long as it is wet. Rather, the Board expressly *recognized* that accumulation "necessarily includes a temporal element," and that the impoundment had to allow CCR and liquid to accumulate long enough to settle CCR. In fact, that assessment was consistent with Dehlin's position. The Board's determination that CCR surface impoundments may include even short durations of held accumulation was not unreasonable.

¶ 59   Midwest also insists that, for accumulation to occur, there must be a barrier at the bottom of the unit to "hold" the liquid and CCR for possible future use, referencing examples of a knife rack holding knives, not allowing them to slide through the rack, or a jug holding a gallon of liquid. Midwest contends that the mere presence of CCR in an area, even where it fell out of sluiced CCR materials, does not demonstrate that the area held an accumulation of CCR *and* liquids.  It asserts that, here, the natural sand floor allowed water to pass through and, "[u]nlike sedimentation, infiltration does not require time to operate, only an appropriate filtering medium."  However, the Board reasonably determined that, even with a filtering medium, accumulation could occur with enough time to deposit CCR and that regular sluicing to the sand provided adequate retention time or "holding" to allow for accumulation and CCR settlement within the dunes' boundaries.  Indeed, the record contains evidence supporting that finding.  *Marconi*, 225 Ill. 2d at 540 ("[s]o long as the record contains evidence supporting the agency's decision, that decision should be affirmed"). LeCrone explained that regularly sluiced CCR and liquid sent to the sand dunes could accumulate long enough to allow some sedimentation of the CCR while infiltration was occurring.  Further, Dehlin agreed that regular sluicing could have resulted in CCR buildup in the dune depressions, essentially clogging the sand dune filter and allowing for backup or accumulation of the sluiced CCR and water for an unknown period.  Dehlin also acknowledged that the original sand floor would have seen a buildup of ash, such that the water would have potentially accumulated. Midwest nevertheless emphasizes that, even if there was incidental or transient holding, the existence of the south ditch demonstrates that the purpose of the field was not to hold water but, instead, to remove it.  However, the evidence reflected that the south ditch would have served to divert and convey accumulated water or overflow from the grassy field to Lake Michigan, which suggests that liquid *did* accumulate for a period in the area that is now the grassy field.  Thus, the

- 30 -

Board reasonably found that the volume of liquid was held with sufficient time to allow for accumulation. Indeed, Dehlin testified one of the goals of the south ditch would been to prevent any overflowing water from running onto the southern neighbor's property. Collectively, even if the evidence reflected that the south ditch and infiltration served to carry water away from the grassy field, the Board could have reasonably found that the evidence also supported a finding that the grassy field held accumulated CCR *and* liquid for a period long enough to allow for a combination of sedimentation and infiltration.

¶ 60    Finally, we address the "designed" component of the definition. Midwest contends that the Board found that sluiced material was conveyed into an area designed to hold an accumulation, but it did not explain "how the naturally occurring topography of a dune field was or could be 'designed' to hold CCR or liquids or both." Midwest argues that the Board must have determined that any sand dune anywhere would be designed to hold an accumulation by virtue of its sheer existence, an interpretation that stretches the ordinary meaning of the word "design" to its breaking point. In contrast, Midwest emphasized below that Dehlin explained that both the dictionary definition of "design" and the engineering term of art "designed" mean that there is intent for the design to serve a specific function. Here, Midwest contends, the evidence reflects that the only design involved was the addition of ditches to promote drainage of the liquids away from the area, not to hold them there. It argues that taking advantage of the natural sand dunes is not "designing" anything and, further, that just because something serves to "hold" for a period does not mean it was designed to do so. Again, we disagree.

¶ 61    The Act does not define the term "designed," and courts may reference dictionary definitions when considering the plain and ordinary meaning of undefined statutory terms. See *Khan v. Deutsche Bank* AG, 2012 IL 112219, ¶¶ 75-76 (also noting, "[w]here a term is undefined,

- 31 -

we presume that the legislature intended the term to have its popularly understood meaning"). Midwest focuses on meaning of "design" as Dehlin described it from a dictionary definition, *i.e.*, design suggests intent for a specific function. This is not necessarily incorrect, depending on the application. However, to the extent that Midwest argues that the Board could not consider use of the site's natural topography as "design" because it pre-existed the facility and occurred naturally, we disagree. Indeed, Dehlin's definitions concerned the verb "design," whereas the noun includes definitions such as "an underlying scheme that governs functioning, developing, or unfolding." Design, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/ dictionary/design (last visited Feb. 10, 2016). In our view, there is a slight distinction between actively designing something to serve a function (such as a colander or sieve), as opposed to a design that already exists and is, therefore, intentionally utilized for a function (natural sand dunes). The statute necessarily embraces the latter, for it includes natural topographic depressions as vessels for surface impoundments. In addition, the Board noted that the definition of "dike" included natural materials that serve a particular function, namely, forming natural barriers that prevented movement of CCR and liquid. Obviously, natural designs are distinct, even within the CCR surface impoundment definition, from manmade ones, but the word "designed" modifies both. Thus, it is reasonable to interpret the definition's term "designed," when applied to natural elements, as recognizing that a natural design may inherently function as an impoundment or might be capitalized upon to serve that purpose. Indeed, when asked to provide an example of a natural topographic depression that would satisfy the definition of "design," Dehlin described a hypothetical lake into which CCR was sluiced and then, after settlement, was removed from the opposite side. The lake itself was obviously not "designed" with the intent to hold CCR and liquid. Rather, this hypothetical aptly demonstrates a scenario wherein a natural design is capitalized upon

to serve a specific purpose. The same may be said for the grassy field. The Board reasonably found that, at some point, a decision was made to take advantage of the sand by running a pipe from the facility out to the existing dunes. Indeed, the dunes did not simply hold CCR and liquid by chance (in contrast to a road temporarily holding water in a storm); rather, the facility *intentionally directed* sluiced material there to take advantage of the natural topography. The design of the dunes naturally held the sluiced materials until CCR was left behind, either when the water was absorbed through infiltration or, if infiltration was "clogged," by settling out. Together, the design held an accumulation of both CCR and liquid. Accordingly, we disagree that the Board's decision ignored and rendered meaningless the definition's "design" element.

¶ 62   In sum, the Board reasonably interpreted the statute and evidence to conclude that the grassy field was once a CCR surface impoundment, and, therefore, now constitutes an inactive CCR surface impoundment. Accordingly, Midwest did not establish the first required factor for an adjusted standard and, thus, also failed to satisfy the second factor. The Board, therefore, did not err in denying Midwest's petition.

¶ 63   We briefly respond to Midwest's contention that the Board's decision was inherently contradictory, where it found the adjusted standard would be consistent with federal law because the grassy field is both a CCR surface impoundment and a CCRMU under the federal rule. It contends that, where the Board found that the EPA would consider the grassy field a CCRMU, its classification of the field as a CCR surface impoundment was both inherently contradictory and in conflict with federal law. We disagree.

¶ 64   Preliminarily, the Board's finding regarding the fourth factor required for an adjusted standard, *i.e.*, whether the adjusted standard would be consistent with federal law, was unnecessary, as Midwest's petition had already failed on the first and second factors. Moreover, in context, the

Board was clearly explaining that, if it did not regulate the grassy field as a CCR surface impoundment, the EPA would likely do so as a CCRMU.

¶ 65   Further, it appears that the statutory scheme allows a degree of potential conflict or overlap. Specifically, in 2019, the general assembly directed the Agency to promulgate, and the Board to adopt, comprehensive rules governing the closure of CCR surface impoundments.  See 415 ILCS 5/22.59 (West 2020); *Midwest Generation, LLC v. Illinois Pollution Control Board*, 2024 IL App (4th) 210304, ¶ 14.  While Midwest asserts that the definition of CCR surface impoundment was, in fact, "copied" from its federal counterpart, the legislature nevertheless directed that the rules must be "at a *minimum*," "at *least* as protective and comprehensive as the federal regulations" governing CCR surface impoundments as promulgated by the EPA (emphases added) (415 ILCS 5/22.59(g)), and it granted the Board authority to promulgate rules that are *more* protective than the federal ones (*Midwest Generation*, 2024 IL App (4th) 210304, ¶¶ 14, 63-64).  Midwest points out that the EPA in the preamble to the CCRMU rule and other documents identified only two CCR surface impoundments on the Waukegan property and elsewhere identified the area constituting the grassy field as something other than a surface impoundment, thus reflecting the Board is incorrect.  However, again, there may be multiple scenarios where the Board's interpretation of its rules as applied to an alleged CCR surface impoundment could exceed or conflict with federal regulations.  Indeed, "the plain language of the Act establishes that the legislature did not restrict the Board to regulating the 'same universe' of surface impoundments as the federal regulations."  *Id.* ¶ 62.  Further, "the plain language of the Act demonstrates that the legislature directed the Board to promulgate rules that would protect Illinois groundwater from CCR contamination at existing CCR surface impoundments at active or inactive plants."  *Id.* ¶ 63.  As such, the legislative design might give rise to tensions or conflicts between the state and federal

regulations as applied to a specific area. Therefore, while we do not agree that the Board here made inherently contradictory findings, to the extent its conclusion that the federal CCRMU rule might regulate the grassy field if the Board found that it was not a CCR surface impoundment, that scenario does not appear inconsistent with the statutory and regulatory scheme. And, indeed, the Board found that the EPA described an example of a CCR surface impoundment that was *consistent* with the grassy field's operations. In sum, we do not agree that federal guidelines serve to render the Board's decision erroneous. Moreover, while we are not unsympathetic to Midwest's concern about potential challenges in attempting to satisfy multiple and possibly competing timelines and regulations, those concerns are simply speculative at this juncture.

¶ 66                                    III. CONCLUSION

¶ 67    For the reasons stated, we affirm the Board's decision denying Midwest's petition.

¶ 68    Affirmed.